STATE

v.

**Michael R. GRAYHURST.**

No. 2001–119–C.A.

Supreme Court of Rhode Island.

June 23, 2004.

492

Jane M. McSoley, Esq., Providence, For Plaintiff.

Robert B. Mann, Esq., Providence, For Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and FLAHERTY, JJ.

## OPINION

WILLIAMS, Chief Justice.

The defendant, Michael R. Grayhurst (defendant), appeals from his convictions on twenty-five criminal counts after a jury trial in the Superior Court. The defendant contends that his convictions should be overturned for various reasons, which are enumerated below. For the reasons indicated hence, we affirm the judgment of the Superior Court.[1]

### I

### Facts and Travel

A therapist once commented on the problem of "Women Who Love Too Much."[2] The defendant is a man who by his own admission loves too much; he is, in fact, a man who claims to "love the s* * * out of" his ex-wife, Jane Grayhurst (Ms. Grayhurst). Ms. Grayhurst filed for divorce in 1994. In 1996, Ms. Grayhurst sought and was granted a no-contact order from the District Court enjoining defendant from harassing or threatening her. The divorce was finalized in 1997. In 1998, after defendant had violated the no-contact order numerous times, Ms. Grayhurst obtained a second no-contact order from the District Court. Despite the no-contact orders, defendant, who was incarcerated at the Adult Correctional Institutions (ACI), began sending Ms. Grayhurst mail. The correspondence consisted of greeting cards, letters, pamphlets and newspaper clippings on topics such as domestic violence and alcoholism. The correspondence additionally included threats against Ms. Grayhurst and various public officials, including judges. Ms. Grayhurst eventually decided to contact authorities about the correspondence, and in November 1997 contacted the office of the Special Assistant Attorney General Bethany Macktaz and Detective John A'Vant (Det.A'Vant)[3] of the Rhode Island State Police. A mail monitor subsequently was placed on all outgoing mail that defendant sent to Ms. Grayhurst.

Additionally, in 1997, as he was leaving the courtroom after a hearing before General Magistrate John O'Brien of the Family Court relating to the sale of the Gray-

1. After a recent order for a competency-to-stand-trial evaluation issued by Superior Court Justice Susan McGuirl, Dr. Alice Lee Vestner of the Eleanor Slater Hospital evaluated defendant and found him incompetent to stand trial on charges that currently are pending in the Superior Court. Because this competency evaluation relates only to those pending charges, and does not purport to evaluate defendant's competency during the trial in this case, this evaluation has no effect on the case at hand.

2. Robin Norwood, *Women Who Love Too Much* (1985).

3. Detective A'Vant has since been promoted to the rank of corporal.

hursts' marital domicile, defendant yelled at General Magistrate O'Brien, "stick it up your ass, you son of a bitch." Upon hearing this, General Magistrate O'Brien ordered that defendant be brought back into the .courtroom. The defendant resisted being brought back into court, and, during the struggle, kicked Deputy Sheriff Richard Ploude (Sheriff Ploude), who suffered serious injuries and who testified that he has been unable to return to work since the 1997 Family Court incident. As a result of the incident, General Magistrate O'Brien found defendant in contempt of court.

Based on defendant's continued violation of the no-contact orders, as well as a complaint that General Magistrate O'Brien lodged with the Rhode Island State Police, Det. A'Vant decided to charge defendant with violating a no-contact order and with threatening a public official. Detective A'Vant subsequently arranged to interview defendant at the ACI to inform him of the pending charges. The defendant eventually was charged with nine counts of threats to public officials, ten counts of violating a no-contact order, three counts of extortion and blackmail, one count of stalking, one count of assault on a uniformed sheriff/officer and one count of obstructing a police officer.

The Attorney General filed three informations, charging defendant with the above-mentioned criminal counts, against defendant: information No. P2/00–1114A, which was filed on March 22, 2000; information No. P2/97–3209A, which was filed on September 23, 1997; and information No. P2/00–1052A, which was filed on March 16, 2000. After a jury trial in the Superior Court, defendant was convicted on twenty-five counts and sentenced to a total of thirty-five years to serve. The individual sentences defendant was given on each count are included in the chart of charges, convictions and sentences imposed, in the Appendix to this opinion.

## II .

## Double Jeopardy

■■■ The defendant argues that (1) his conviction on count 1 of information No. P2/97–3209A for assaulting Sheriff Ploude was based on the same acts for which General Magistrate O'Brien found defendant to be in contempt of court; therefore, the assault charge should be barred on double jeopardy grounds; (2) his conviction on count 1 of information No. P2/00–1052A for extortion and blackmail should merge with count 21 of the same information for violation of a no-contact order because a letter defendant sent to Ms. Grayhurst formed the basis for both of these charges; and (3) his conviction on count 10 of information No. P2/00–1052A for stalking should merge with counts 12, 17, 18, 21, 23 and 26 of the same information for violations of a no-contact order because defendant's repeated contacts with Ms. Grayhurst, by the correspondence defendant sent her, formed the basis of both charges of stalking and the violations of a no-contact order. Merger is essentially a double jeopardy argument. *State v. Boudreau*, 113 R.I. 497, 502, 322 A.2d 626, 629 (1974).

■■■ The defendant failed to present a double jeopardy argument before trial. Relying on Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure, we have held that "the defense of double jeopardy can be raised only by a motion filed before trial and that a defendant's failure to so move constitutes a waiver of his or her right to do so (though the court, for cause shown, may grant relief from the waiver)." *State v. McGuy*, 841 A.2d 1109, 1115 (R.I.2003); *see also State v. Haney*, 842 A.2d 1083, 1084 (R.I.2004). "[T]he

strong policy favoring the pretrial presentation of a double-jeopardy motion bars its use at such a late post-trial date absent some compelling reason to grant relief from the waiver sanction of Rule 12(b)(2)." *McGuy*, 841 A.2d at 1115. This Court perceives no such compelling reason here "to relieve defendant of having waived any double-jeopardy argument by his failure to move on this basis in a timely manner before trial." *Id.*

■ Moreover, even if defendant had not waived his double jeopardy argument, we would not overturn any of his convictions on this ground. The prohibition against double jeopardy contained in the Fifth Amendment to the United States Constitution is echoed in Article 1, section 7, of the Rhode Island Constitution, which provides "[n]o person shall be subject for the same offense to be twice put in jeopardy." The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal" or conviction. *State v. Rodriguez*, 822 A.2d 894, 905 n. 13 (R.I.2003) (quoting *United States v. Abreu*, 952 F.2d 1458, 1464 (1st Cir.1992)). It also protects against "multiple punishments for the same offense." *Id.* (quoting *Abreu*, 952 F.2d at 1464). In determining whether an accused is in danger of being punished more than once for the same offense, "the applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 905 (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

■ We initially note that defendant never was charged with contempt, and therefore, we assume that it was civil contempt. Double jeopardy does not preclude criminal punishment after a civil sanction has been imposed. *See Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (stating that the double jeopardy clause "protects only against the imposition of multiple *criminal* punishments for the same offense"). Even if this were treated as criminal contempt, however, there would be no double jeopardy violation. In this case, the crimes of criminal contempt and assault of a police officer constitute separate crimes with different elements for each. "[C]riminal contempt is punitive and designed to vindicate the dignity of the court * * *." *State v. Price*, 820 A.2d 956, 969 (R.I.2003). The crime of assault of police officers and other officials is defined as the knowing and willful striking of a uniformed sheriff." G.L.1956 § 11–5–5. Of these two crimes, only contempt requires an attack on the dignity of the court. A conviction under § 11–5–5 requires proof of an unlawful striking of a uniformed officer. Therefore, although both the contempt and the assault charges arise out of the same incident, "each offense requires proof of a fact that the other does not." *In re Malik D.*, 730 A.2d at 1070, 1074 (R.I.1999).

■ The defendant's argument that his conviction for extortion and blackmail should merge with one of his convictions for violating a no-contact order on count 21 of information No. P2/00–1052A also fails. Pursuant to G.L.1956 § 11–42–2, "this [C]ourt has consistently stated that the crime of extortion [and blackmail] consists of two basic elements: (1) an oral or a written threat to harm a person or property, (2) accompanied by the intent to compel someone to do something against his or her will." *State v. Price*, 706 A.2d 929, 933 (R.I.1998). The crime of violating a no-contact order consists of intentionally contacting a victim in contravention of such an order. *See State v. Conti*, 672 A.2d 885,

886 (R.I.1996) (per curiam) (stating that the defendant's conduct, which consisted of greeting the victim at the post office and while driving, did not violate a no-contact order because the meetings were coincidental, and implying, therefore, that a defendant's contact with a victim must be intentional for it to violate a no-contact order). Conviction for extortion and blackmail, however, requires proof of both a threat and of intent to force someone to act against his or her will. Section 11–42–2. In addition, unique to a conviction for violating a no-contact order is the requirement that a no-contact order be in place. Thus, the two crimes require proof of separate and additional facts that the other does not.

▬▬▬ The defendant makes a final double jeopardy argument relating to his convictions for stalking and for certain violations of no-contact orders (P2/00–1052 counts 10, 12, 13, 17, 18, 21, 23 and 26). According to defendant, the stalking count merged with the counts alleging violation of a no-contact order. We disagree.

General Laws 1956 § 11–59–2 provides: "(a) Any person who: (1) harasses another person; or (2) willfully, maliciously, and repeatedly follows another person with the intent to place that person in reasonable fear of bodily injury, is guilty of the crime of stalking." Harassing is defined by § 11–59–1(2) as

> "a knowing and willful course of conduct directed at a specific person with the intent to seriously alarm, annoy, or bother the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury."

Section 11–59–1(1) defines course of conduct as "a pattern of conduct composed of a series of acts over a period of time, evidencing a continuity of purpose."

Accordingly, conviction for stalking requires proof of harassment over a period of time. As stated above, a conviction for violating a no-contact order also requires that a no-contact order be in place. Thus, stalking and violating a no-contact order each require proof of separate and additional facts that the other does not.

### III

### Rule 16

On April 3, 2000, the day before the state rested, the state presented the defense with a supplemental answer to defendant's discovery request. According to defense counsel, the supplemental answer identified a Department of Corrections officer, Officer James Greenless (Officer Greenless) who was expected to testify that on May 19, 1998, while conducting a search of defendant's cell, he seized a piece of paper entitled "Mike's list," which contained twenty names. Officer Greenless was further expected to testify that the list was defendant's "hit list." The supplemental answer also included a reference to an attached disciplinary report, as well as to the handwritten, one-page list.

At trial, defense counsel said that, before April 3, 2000, information relating to the "hit list" had been given to him as part of the discovery process. According to the defense, this information consisted of a computer printout labeled "description" and stating that "on the above date and time I[4] found a note in inmate's cell with names of officers and brass on it. When

---

**4.** Presumably, "I" refers to Officer Greenless, who conducted the search of defendant's cell

at the ACI.

asked what it was, inmate stated, quote, 'it's my hit list.' " According to defendant, because the state possessed this computer printout, the state should have been alerted to the possibility that the "hit list" existed. Thus, defendant asserts, the state failed to fulfill its duty to exercise due diligence in locating the list.

When the state sought to introduce the list, defense counsel objected on grounds that the list was so prejudicial that if it were allowed into evidence, defendant could not receive a fair trial.[5] At least twelve of the twenty names on the "hit list" appeared, however, in an April 1998 letter defendant wrote to his wife. After confirming with defense counsel that he knew of twelve of the names on the hit list, the trial justice stated that the additional names would be redacted. The defense counsel objected, and requested that the list be "redact[ed] in its entirety." The trial justice asked "Okay. But that means you're waiving your Rule 16 objection?" The defense counsel responded "I object and ask it be redacted in its entirety. So, if that means I waive the objection, then so be it." The court answered "So you're waiving your Rule 16 objection?" and defense counsel said "yes, yes, your Honor."

The defendant argues that the late disclosure of this information constitutes a prejudicial violation of Rule 16 of the Superior Court Rules of Criminal Procedure. The state counters that it received the list late on Friday, March 31, 2000, and gave the list to defense counsel early on Monday, April 3, 2000, and, therefore, did not deliberately violate Rule 16.

Rule 16(a) outlines the state's obligation to

"permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:

(1) all relevant written or recorded statements or confessions * * * made by the defendant, * * *

* * *

(6) a written summary of testimony that the State intends to use * * *

(7) a written list of the names and addresses of all persons whom the attorney for the State expects to call as witnesses at the trial in support of the State's direct case * * *."

Rule 16(h) additionally provides that "[i]f, subsequent to compliance with a request for discovery * * * and prior to or during trial, a party discovers additional material previously requested which is subject to discovery or inspection under this rule, he or she shall promptly notify the other party of the existence thereof." Finally, Rule 16(i) states that

"[i]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule * * * it may * * * grant a continuance, or prohibit the party from introducing in evidence the material which [was] * * * not disclosed * * *."

■ We initially note that defense counsel waived his Rule 16 objection when he responded to the trial justice's question about whether he was waiving his Rule 16 objection by stating "yes, yes, your Honor." According to defendant, defense counsel did not voluntarily waive his Rule 16 objection, but rather chose the lesser of

---

**5.** When the state called the corrections officer to the stand, defense counsel failed to object. Thus, defendant has failed to preserve his right to object to this testimony on appeal. *State v. Rodriguez,* 822 A.2d 894, 901 (R.I. 2003).

two unappealing alternatives. We need not decide this issue, however, based on our conclusion that Rule 16 was not violated.

■ As defense counsel noted, the computer printout merely revealed that "there was a note found which had the names of officers and brass on it." The April 1998 letter from defendant to his wife also contained the names of public officials. Thus, the state, like defense counsel, had no reason to think that the computer printout referred to a list of names other than that which appeared in the April 1998 letter. The state asserts that it was unaware of the existence of the "hit list" until late Friday on March 31. In accordance with the requirements of Rule 16(h), the state turned the list over to defendant promptly on Monday morning.

Moreover, admission of the "hit list" into evidence did not constitute error, as the trial justice offered defense counsel several remedies for any Rule 16 violation that may have occurred. The trial justice offered to redact those names that did not appear in the April 1998 letter defendant wrote to Ms. Grayhurst, to continue the case so that defense counsel could respond to the list, and even brought up the possibility of declaring a mistrial. The defense counsel, however, turned down the trial justice's offers to redact names or to grant a continuance, and failed to move for a mistrial.

This Court further notes that defendant was not unduly prejudiced by the late date of disclosure of the "hit list." Evidence about defendant's death threats to twelve of the people, all public officials except for Ms. Grayhurst, on the "hit list" already had been introduced. Hence, evidence about similar threats against several additional public officials was not likely to prejudice the defense unduly or sway or confuse the jury.

## IV

### Evidentiary Rulings

#### A

#### The Contents of the Envelope Labeled as Exhibit Four

The defendant contends that the trial justice improperly permitted the state to introduce Exhibit No. 4. Exhibit No. 4 is an envelope and its contents that defendant sent to Ms. Grayhurst in care of her father relating to the prevention of domestic violence. According to defendant, the contents of the envelope constitute inadmissible hearsay, and, moreover, are more prejudicial than probative.

■ "It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" *State v. Reis*, 815 A.2d 57, 61 (R.I.2003) (quoting *State v. Andreozzi*, 798 A.2d 372, 374–75 (R.I.2002)).

#### 1

#### Hearsay

■ Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "It is axiomatic that an out-of-court statement is not hearsay unless it is offered for the truth of the matter asserted." *State v. Gomes*, 764 A.2d 125, 131 (R.I.2001) (quoting *State v. Johnson*, 667 A.2d 523, 530 (R.I.1995)). "Statements not offered to prove the truth of what they assert are not hearsay and as such do not require the assistance of an exception to the hearsay rule in order to

be admissible." *Id.* (quoting *In re Jean Marie W.,* 559 A.2d 625, 629 (R.I.1989)).

Here, the contents of the envelope were not offered "to prove the truth of the matter asserted." Rule 801(c). The contents were not offered to prove the truth of the information on domestic violence; rather, they were offered as evidence of defendant's attempt to contact his ex-wife in violation of the no-contact order. Thus, the contents of the envelope do not constitute inadmissible hearsay.

## 2

### The Relevancy and Probative Value of the Contents of the Envelope Labeled as Exhibit No. 4

The defendant further argues that the contents of the envelope labeled as Exhibit No. 4 are both prejudicial and irrelevant. It is well settled that "[d]ecisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice; this Court will not disturb those decisions on appeal absent an abuse of discretion." *State v. Pena–Rojas,* 822 A.2d 921, 924 (R.I.2003) (citing *State v. Botelho,* 753 A.2d 343, 350 (R.I.2000)). "Furthermore, when reviewing such decisions, we will not conclude that a trial justice abused his or her discretion as long as some grounds to support the decision appear in the record." *Id.*

Rule 401 of the Rhode Island Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 of the Rhode Island Rules of Evidence adds that "[a]ll relevant evidence is admissible * * *. Evidence which is not relevant is not admissible." Finally, Rule 403 of the Rhode Island Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This Court has held that "Rule 403 may be invoked to exclude evidence that is prejudicial to defendant to the extent that the negative effect outweighs its probative value. Such evidence is rendered inadmissible if it is prejudicial and irrelevant." *State v. Grundy,* 582 A.2d 1166, 1172 (R.I.1990).

The state had to demonstrate that defendant's conduct was intentional to prove that he violated the no-contact order. *See Conti,* 672 A.2d at 886. The fact that defendant sent mail to Ms. Grayhurst demonstrates that defendant intentionally contacted her in contravention of the no-contact order. The contents of the envelope that defendant sent to Ms. Grayhurst, however, do not make it any more or less probable that defendant intentionally contacted her. Thus, the contents are irrelevant.

Although the contents of the envelope are irrelevant to determine violation of the no-contact order, they are relevant to the charges of stalking. Section 11–59–1(2) states that the crime of stalking occurs when a person harasses another person by following "a knowing and willful course of conduct * * * with the intent to seriously alarm, annoy, or bother the person * * * such as would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury."

Given defendant and Ms. Grayhurst's tumultuous history, the contents of the envelope relating to prevention of domestic violence would upset Ms. Grayhurst and are, therefore, relevant to show that defendant intended to "seriously alarm, annoy

506 ■

or bother" her, § 11–59–1(2), in contravention of § 11–59–2. In addition, the probative value of this evidence is not "substantially outweighed by the danger of unfair prejudice." R.I.R.Evid. 403. Given the numerous other examples of such correspondence admitted into evidence, it is highly unlikely that this example would unduly prejudice defendant or mislead or confuse the jury.

3

**Prior Bad Acts**

■ The defendant argues the trial justice improperly permitted the introduction as exhibits of two letters he wrote to Ms. Grayhurst, which include threats to Ms. Grayhurst's life and safety, because they constituted inadmissible evidence of prior bad acts. The defendant additionally contends that the testimony is both irrelevant and more prejudicial than probative. Rule 404(b) of the Rhode Island Rules of Evidence provides that

"[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident * * *."

■ This court previously has held that "evidence of past, uncharged criminal behavior of an accused is generally inadmissible in a criminal trial to prove a defendant's propensity to commit the crime charged." *Reis*, 815 A.2d at 61 (quoting *State v. Pratt*, 641 A.2d 732, 742 (R.I. 1994)). This type of evidence normally is inadmissible because the "prejudicial effect of such evidence has been traditionally viewed as outweighing its probative value by acting to predispose jurors to believe a

defendant's guilt." *Id.* In addition, if evidence of other crimes, wrongs, or bad acts is admitted, then there is a "risk that jurors might convict a defendant for a crime other than the one being charged." *Id.* at 62.

■ "Rule 404(b) represents an exception to the above-stated general rule." *Reis*, 815 A.2d at 62. The rule permits evidence of prior bad acts when they are "'interwoven' with the offense charged." *Id.* (quoting *Pratt*, 641 A.2d at 742). In addition, as provided in Rule 404(b), such evidence is admissible to show a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." Because of the risks involved in introducing evidence of prior bad acts, "'the trial justice must carefully weigh the probative value of the evidence against the danger of unfair prejudice * * *.'" *Reis*, 815 A.2d at 62. "If the trial justice determines that the probative value does outweigh the prejudicial effect, he should offer 'a specific instruction [to the jury] as to the limited purpose for which the evidence is being introduced.'" *Id.* (quoting *Pratt*, 641 A.2d at 742).

The defendant's implicit reliance on the general rule that "past, uncharged criminal behavior" is inadmissible is misplaced. *Id.* at 61. The contents of the letters defendant sent to Ms. Grayhurst do not constitute evidence of other crimes. Instead, the contents of the letters were introduced as evidence that defendant committed one of the crimes with which he was charged, which was violation of a no-contact order.

Moreover, although the contents of the envelopes are not, as discussed above, relevant to show violation of the no-contact order, any error on the part of the trial justice in admitting the letters is harmless error. As stated earlier, given the numerous other examples of such correspon-

dence admitted into evidence, it is highly unlikely that additional letters would unduly prejudice defendant or mislead or confuse the jury.

## B

### Testimony of General Magistrate O'Brien, Justice Indeglia, Judge Erickson, Sheriff Ploude and Detective A'Vant

#### 1

#### The Testimony of General Magistrate O'Brien

General Magistrate O'Brien testified at trial that defendant came before him in 1997 for a hearing in the Family Court. General Magistrate O'Brien then testified about his personal observations of defendant's courtroom outburst. General Magistrate O'Brien also testified that "one of the deputy sheriffs was injured and to my belief remains out of work from two years after whatever it was." The state then asked General Magistrate O'Brien whether the injured and out-of-work deputy sheriff was the sheriff defendant kicked during his courtroom altercation.[6] General Magistrate O'Brien responded that he did not know whether the injured and out-of-work sheriff and the sheriff defendant kicked were the same person. Next, General Magistrate O'Brien testified that, after the altercation, he found defendant to be in contempt of court. The state asked General Magistrate O'Brien to explain contempt to the jury, and defense counsel objected on grounds that the issue was irrelevant. The trial justice nevertheless allowed the testimony, and General Magistrate O'Brien explained contempt as "a violation of an order. Generally, if someone—if a judge said do this, that and thus and somebody did not do it that is con-

tempt. In this instance * * * I deemed what was taking place to be a disruption."

#### i

#### The Relevance of the Testimony of General Magistrate O'Brien

■ According to defendant, General Magistrate O'Brien's testimony on the deputy sheriff's inability to work was both prejudicial and irrelevant to any of the charges against defendant. Moreover, defendant asserts that General Magistrate O'Brien's testimony on contempt amounted to an opinion about defendant's guilt on the charges of assaulting and of obstructing public officials. Although the testimony at issue was certainly prejudicial, "[a]ll of the evidence that tends to prove that defendant is guilty of a crime might be said to be prejudicial." *State v. Lemon*, 497 A.2d 713, 720 (R.I.1985). Here, "[b]odily injury sustained in the performance of duty is an essential element" in proving assault on a public official. *State v. Pombo*, 110 R.I. 133, 136, 290 A.2d 855, 856 (1972). Therefore, the fact that the deputy sheriff was unable to work for two years after the assault is highly probative of the fact that he did suffer bodily injuries from the assault. As such, the probative value of General Magistrate O'Brien's testimony on this point is not "substantially outweighed by the danger of unfair prejudice," Rule 403, and did not require exclusion of such evidence.

#### ii

#### General Magistrate O'Brien's Testimony did not Constitute Bolstering

■ The defendant also argues that General Magistrate O'Brien's testimony constituted impermissible bolstering of Sheriff Ploude's trial testimony that he was injured during the 1997 altercation

---

**6.** The injured and out-of-work deputy sheriff whom General Magistrate O'Brien mentioned and the sheriff defendant kicked are the same man: Sheriff Ploude.

with defendant in the Family Court and had been unable to return to work. " 'Bolstering' or 'vouching' occurs when one witness 'offers an opinion regarding the truthfulness or accuracy of another witness'[s] testimony.' " *State v. Lassiter*, 836 A.2d 1096, 1107 (R.I.2003) (quoting *State v. Webber*, 716 A.2d 738, 742 (R.I.1998)). "Impermissible bolstering may occur even if the witness does not literally state an opinion concerning the credibility of another witness's testimony." *Id.* (citing *Webber*, 716 A.2d at 742). "If one witness's testimony has the same 'substantive import' as if it addressed another witness's credibility, it is inadmissible." *Id.*

General Magistrate O'Brien's testimony consisted of his retelling of defendant's 1997 courtroom altercation, which he personally observed, and of his decision to hold defendant in contempt after that altercation. During his 1997 courtroom outburst, defendant both assaulted a sheriff and threatened General Magistrate O'Brien. Because the assault and threats formed the basis of the charges before the jury of obstructing a uniformed sheriff/officer, obstructing a police officer, and of one count of threatening a public official, this testimony is probative of those charges. Moreover, in testifying about these points, General Magistrate O'Brien neither offered his opinion about the truthfulness of Sheriff Ploude's testimony, nor gave testimony that had the same " 'substantive import' as if it addressed * * * [Sheriff Ploude's] credibility." *Lassiter*, 836 A.2d at 1107 (quoting *Webber*, 716 A.2d at 742). Thus, the trial justice did not abuse his discretion in allowing this testimony.

### iii

### General Magistrate O'Brien's Testimony did not Improperly Introduce Evidence of Defendant's Prior Bad Acts

■ The defense additionally objected to General Magistrate O'Brien's testimony about several occasions when defendant had angry outbursts in court. The defendant asserts that this testimony constituted inadmissible evidence of prior bad acts. The defendant further contends that the testimony was both irrelevant and more prejudicial than probative.

The defendant was charged with threatening General Magistrate O'Brien, a public official, with death as a result of the lawful performance of his public duties. One of the outbursts that General Magistrate O'Brien described, namely defendant's angry comments to the sheriff assigned to General Magistrate O'Brien, Roy Viera (Sheriff Viera), that he planned to kill General Magistrate O'Brien, formed the basis of these charges. The outburst did, however, form the factual background to the charges against defendant that he threatened public officials. The defendant's courtroom outbursts before General Magistrate O'Brien, even if they were not spoken directly to General Magistrate O'Brien, were a part of the events leading up to defendant's eventual threats against General Magistrate O'Brien. The jurors were entitled to hear this factual background of the circumstances surrounding defendant's threats against General Magistrate O'Brien. *See State v. Garcia*, 743 A.2d 1038, 1051 (R.I.2000) (stating that a defendant's statements to his accomplice about a prior arson were admissible at trial as "part of the factual background concerning how and why [the] crime came to be committed").

Moreover, the testimony is both relevant and is more probative than prejudicial. As important factual background, General Magistrate O'Brien's testimony is relevant. Also, the testimony was not the jurors' only source of information about defendant's courtroom outbursts; Sheriff

Ploude also testified about one of the outbursts. Thus, defendant is not prejudiced by the admission of General Magistrate O'Brien's testimony on this same event.

2

## The Testimony of Justice Indeglia and Judge Erickson

i

### Prior Bad Acts

■ The defense also objected to a portion of the testimony of Superior Court Justice Gilbert Indeglia (Justice Indeglia).[7] Justice Indeglia's testimony concerned two probation violation hearings for defendant: one in 1996 before Justice Indeglia and an earlier violation hearing before a different judge. The defendant asserts that the above-mentioned testimony constituted inadmissible evidence of prior bad acts. The defendant additionally contends that the testimony is both irrelevant and more prejudicial than probative. As described above, the fact that defendant appeared before Justice Indeglia is part of the events leading up to defendant's threats to Indeglia; thus, the jurors were entitled to hear about this factual background. *See Garcia*, 743 A.2d at 1051.

ii

### Hearsay

■ The defendant contends that portions of the testimony given at trial by Det. A'Vant, Justice Indeglia, and Rhode Island District Court Judge Stephen Erickson (Judge Erickson) constitute inadmissible hearsay. The state asked Justice Indeglia whether he ever had received a letter from the ACI. The defense objected on hearsay grounds, but the trial justice allowed the testimony to continue. Justice

Indeglia responded that he had received such a letter, "indicating that [his] name was on a list with others where threats have been made by [defendant] against [him] as well as others." Justice Indeglia's recounting of the contents of the letter from the ACI was offered for its truth, which was that defendant had, in fact, made threats against Justice Indeglia.

We need not consider whether Justice Indeglia's testimony satisfied any exceptions to the prohibition against hearsay because any error in admitting the testimony is harmless. The threats to his life that Justice Indeglia described were admitted into evidence elsewhere. The defendant's 1998 letter to Ms. Grayhurst, in which he speaks of the "thirteen assholes I have to take care of when I get out," and gives a list of names, including Justice Indeglia and Judge Erickson, was read to the jury and placed into evidence absent objection. Thus, the admission of this testimony did not prejudice defendant.

■ Finally, the state asked Judge Erickson whether at some point he became aware that defendant had made a threat against him. After defense objected on hearsay grounds, the trial justice allowed Judge Erickson to answer "yes" and then precluded the state from continuing to ask questions on that point. Judge Erickson's statement, however, is not hearsay. The state did not ask Judge Erickson to recount how he learned of defendant's threat, which may have involved statements made by someone other than Erickson. Instead, the state merely asked Judge Erickson whether he was aware of any threats. Although Judge Erickson's answer to this question does imply that someone at some point told him of defendant's threat, Judge Erickson's answer

---

7. At the time of the events to which Justice Indeglia testified, he was a District Court judge. Justice Indeglia served on the District Court from 1989 to 2000.

does not repeat any such statements or even confirm that such statements occurred.

### iii

### Bolstering

The defendant further argues that the introduction of Justice Indeglia's and of Judge Erickson's testimony constituted inappropriate bolstering of the credibility of defendant's threats. Both Justice Indeglia and Judge Erickson testified that they had learned of defendant's threats against them, and that they were very concerned about those threats. According to defendant, because of the high official status of both Justice Indeglia and Judge Erickson, the testimony presented by each judge about defendant's threats made those threats appear to be serious, rather than merely the rantings and ravings of a troubled man. Bolstering occurs when one witness gives an opinion about the "credibility of another witness's testimony." *Lassiter*, 836 A.2d at 1107.. However, "[o]pinion evidence that tends to corroborate another witness's testimony or substantiate a disputed fact is admissible in limited circumstances." *Id.* at 1109.

We initially note that defendant's bolstering argument is unique in that, because he never testified at his trial,[8] defendant apparently argues that Justice Indeglia's and Judge Erickson's trial testimony bolstered the credibility of the threats contained on the various cards, letters and lists entered into evidence. Even as applied to the credibility of his threats, we find defendant's argument unpersuasive. This case is similar to *State v. Gough*, 810 A.2d 783, 786 (R.I.2002), in which the defendant was convicted of as-

saulting the victim by handcuffing him to a bed. In appealing her conviction, the defendant argued that a police officer's testimony that scarring on the victim's wrists was consistent with the improper use of handcuffs constituted impermissible bolstering of the victim's credibility. *Id.* Because a photograph of the marks was submitted into evidence, however, this Court held that "[t]he jury was assisted with enough facts upon which the officer's opinion was based to assess whether the conclusions drawn possessed sufficient probative force or, rather, were grounded in mere speculation or conjecture." *Id.* Likewise, because defendant's letter detailing the threats about which Justice Indeglia and Judge Erickson testified was admitted into evidence, the jurors were able to assess for themselves whether defendant's threats were genuine. Thus, the testimony of both judges is admissible.

### 3

### The Testimony of Sheriff Ploude and General Magistrate O'Brien was not Unfairly Prejudicial or Irrelevant

The defendant argues that portions of Sheriff Ploude and General Magistrate O'Brien's testimony given at trial were both prejudicial and irrelevant. Sheriff Ploude testified that he was injured while subduing defendant during the 1997 Family Court altercation. During Sheriff Ploude's trial testimony, the state asked him whether he had been able to return to work since the incident, and Sheriff Ploude answered that he had not. General Magistrate O'Brien additionally testified that one of his sheriffs was injured during the 1997 altercation and remained out of work for two years. Here, the testimony demon-

---

**8.** Although defendant did address the trial justice at the start of his trial, he never took the stand as a witness and did not discuss the

credibility of his threats to Ms. Grayhurst and others.

strates the consequences of defendant's alleged assault on Sheriff Ploude, and, as such, the testimony helps prove the extent of Sheriff Ploude's injuries resulting from the assault that occurred while he was carrying out his job. Section 11-5-5. Sheriff Ploude's testimony about his incapacity for work is, therefore, relevant because it tends "to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." R.I.R.Evid. 401. Moreover, the testimony is more probative than prejudicial. As a result, Sheriff Ploude's testimony did not unfairly prejudice defendant or confuse or mislead the jury. The testimony serves only to reveal additional information about an event of which the jury already was aware of after hearing General Magistrate O'Brien testify about defendant's 1997 Family Court outburst.

### 4

### The Testimony of Det. A'Vant

The defendant contends that portions of the trial testimony of Det. A'Vant constitute inadmissible hearsay. Detective A'Vant testified that he was present during defendant's arraignment in the Rhode Island District Court before Judge Patricia Moore for violation of a no-contact order. The state asked Det. A'Vant "[a]nd at that point in time what did Judge Moore do?" The defense then objected without specifying the grounds for the objection. The trial justice allowed Det. A'Vant to answer the question, and Det. A'Vant responded "Judge Moore, she arraigned him and she specifically told him, she imposed another no-contact order and I watched her present him with the document."

■ This Court has held that a general objection, with no explanation of the basis for the objection, does not preserve an issue for appellate review. *See State v. Morris,* 744 A.2d 850, 859 (R.I. 2000). The defense counsel here failed to raise a proper objection, and, therefore, the issue of Det. A'Vant's alleged hearsay testimony has not been preserved for appellate review. Even if this issue had been preserved for appeal the trial justice's decision to allow Det. A'Vant's hearsay testimony would constitute harmless error. Detective A'Vant merely stated that Judge Moore had imposed a no-contact order. The no-contact orders against defendant, however, already were admitted into evidence. Given that the charges against defendant included violations of a no-contact order, he could not have been prejudiced by this statement.

### V

### Attorney–Client Privilege

■ The defendant also argues that the trial justice improperly restricted the defense's cross-examination of Ms. Grayhurst about certain interactions between her and her divorce lawyer, Stephen Prignano (Prignano). On cross-examination, the defense asked Ms. Grayhurst what Prignano told her "with respect to the contents of the envelope when you got, say, the first time that call happened." [9] The state objected, and the trial justice sustained on the grounds that requiring Ms. Grayhurst to answer might violate her right to attorney-client privilege. The defense subsequently asked Ms. Grayhurst whether she and her attorney, presumably Prignano, ever discussed what testimony would be relevant for this trial. The state again objected, and the trial justice again

9. Presumably, this refers to the envelope labeled Exhibit No. 12, since this is the first in a series of exhibits consisting of mail that defendant sent to Ms. Grayhurst via Prignano.

sustained the objection. The defendant contends that the state's objections were invalid because Prignano, who served as a witness for the state, disclosed information about his professional relationship with Ms. Grayhurst, thus waiving attorney-client privilege. Prignano testified that it was his practice, upon his receipt of mail from defendant for Ms. Grayhurst, to call Ms. Grayhurst and inform her that he had received the letter and then to forward it to her.

■ ■ "It is well established that 'communications by a client to his attorney for the purpose of seeking professional advice, as well as the responses made by the attorney to such inquiries, are privileged communications not subject to disclosure.'" *Mortgage Guarantee & Title Co. v. Cunha,* 745 A.2d 156, 158–59 (R.I. 2000) (quoting *Callahan v. Nystedt,* 641 A.2d 58, 61 (R.I.1994)). Generally, "attorney-client communications are protected only if the privilege has not been explicitly or implicitly waived by the client." *Id.* "The principle that the attorney-client privilege is implicitly waived when a party puts an attorney-client communication at issue * * * is well accepted in American jurisprudence." *Id.*

This Court first notes that Prignano's testimony at this trial occurred after Ms. Grayhurst gave the contested portions of her testimony.[10] Thus, given that Prignano's supposed waiver of attorney-client privilege occurred after Ms. Grayhurst testified, such a waiver would not apply to compel Ms. Grayhurst to testify about protected communications.

Moreover, even if Prignano had testified before Ms. Grayhurst did, his testimony did not effectuate a waiver of attorney-

client privilege. Prignano's testimony consisted of (1) a description of his practice of notifying Ms. Grayhurst of his receipt of mail from defendant before forwarding it to her; (2) a statement that he discussed the contents of such mail with Ms. Grayhurst and that she appeared on several occasions to be upset by the mail; (3) his own recollections of the 1997 outburst by defendant that occurred in Family Court during the divorce proceedings between defendant and Ms. Grayhurst; and, (4) his knowledge of Ms. Grayhurst's decision to contact the police about the mail defendant was sending to Ms. Grayhurst through Prignano. None of this testimony results in an implicit waiver of attorney-client privilege because none of it concerns communications between Prignano and Ms. Grayhurst that were made "for the purpose of seeking professional advice." *Cunha,* 745 A.2d at 158 (quoting *Callahan,* 641 A.2d at 61).

■ Similarly, the statements made by Prignano and Ms. Grayhurst to the police before trial did not effectuate a waiver of attorney-client privilege. Prignano testified at trial that, at the time Ms. Grayhurst contacted police about defendant's threats to her, he spoke with Det. A'Vant and signed several witness statements. Prignano's testimony about his conversation with Det. A'Vant and the witness statements was limited to the events that occurred in open court, namely the 1997 Family Court outburst, and the mail from defendant. When Ms. Grayhurst contacted the authorities, she showed police the contents of the mail defendant sent to her. Neither Ms. Grayhurst nor Prignano revealed attorney-client protected communications to police. Thus, attorney-client privilege was not waived, and Ms. Gray-

---

**10.** After Prignano's testimony concluded, Ms. Grayhurst was recalled to the stand. The defendant does not argue, however, that the trial justice impermissibly restricted this portion of Ms. Grayhurst's testimony.

hurst was not required to answer the defense counsel's questions pertaining to protected communications.

## VI

### Motion to Suppress

The defendant next argues that the trial justice improperly denied his motion to suppress a statement that he made to Det. A'Vant. At trial, Det. A'Vant testified that in 1998 he met defendant at the ACI to interview him about a complaint lodged against him. The complaint concerned threats defendant made to public officials as well as violations of no-contact orders. According to Det. A'Vant, he prepared a *Miranda* rights form pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and brought it with him for his meeting with defendant, which occurred in a maximum security section of the ACI. After Det. A'Vant informed defendant of the allegations that had been made against him, he requested that defendant read and sign the rights form. Instead, defendant, who became highly agitated after learning of the charges against him, said "something to the effect that [his wife] knows what's coming." Detective A'Vant responded "what do you mean?" and defendant answered "I'm going to put a bullet in her head." According to defendant, his response to Det. A'Vant's question should be suppressed because defendant did not receive *Miranda* warnings before making the statement. The state responds that defendant's statements were voluntary and unsolicited, and that *Miranda* does not, therefore, apply.

■■■ It is well settled that this Court "will reverse a trial justice's findings on a motion to suppress only if (1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *Garcia*, 743 A.2d at 1044. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Briggs*, 756 A.2d 731, 736 (R.I.2000) (quoting *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I. 1998)).

■■■ The United States Supreme Court has held that "prior to custodial interrogation a suspect must receive explicit warnings concerning his constitutional privilege against self-incrimination and his right to counsel." *State v. Amado*, 424 A.2d 1057, 1061 (R.I.1981) (citing *Miranda*, 384 U.S. at 478–79, 86 S.Ct. 1602). This Court has additionally applied the United States Supreme Court's ruling "that a suspect does not lose his right to receive *Miranda* warnings simply because he is already incarcerated for an offense separate from that which his interrogators wish to question him." *Id.* at 1061 n. 3 (citing *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)).

■■■ We initially note that defendant's first statement to Det. A'Vant, which was that Ms. Grayhurst knew what was coming, was a spontaneous statement, spoken before Det. A'Vant addressed any questions to him. "[T]he exclusionary rule of *Miranda* * * * does not come into play unless it is triggered by two factors: (1) custody, and (2) interrogation." *State v. Edwards*, 810 A.2d 226, 239 (R.I.2002). Thus, defendant's first statement was admissible because it was not the product of interrogation.

■■■ The defendant's statement that he was going to put a bullet in Ms. Grayhurst's head, which followed Det. A'Vant's

question "what do you mean?" also is admissible. Detective A'Vant attempted to inform defendant of his *Miranda* rights, but defendant refused to listen. In such a set of circumstances, defendant has waived his right to be informed. *State v. Thomas,* 16 Wash.App. 1, 553 P.2d 1357, 1363 (1976); *see also State v. Ouimette,* 110 R.I. 747, 774–75, 298 A.2d 124, 140 (1972). Accordingly, defendant is estopped from asserting his right to *Miranda's* protection. *State v. Walden,* 336 N.W.2d 629, 632 (N.D.1983).

 Even if defendant were not estopped from asserting that his rights pursuant to *Miranda* were violated, Det. A'Vant did not interrogate defendant. The United States Supreme Court has held that interrogation consists of both direct questioning and of words or actions that "the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Taken in context, Det. A'Vant's question "what do you mean?" did not constitute interrogation. This question was merely an instinctive reaction, provoked by defendant's initial statement that his wife knew what was coming. Thus, the exclusionary rule of *Miranda* would not have been triggered. Detective A'Vant, moreover, terminated the interview almost immediately after this colloquy between himself and defendant.

 Finally, aside from the procedural barrier, and even if Det. A'Vant's question did constitute interrogation, any error in admitting defendant's statement is harmless. Rule 52 of the Superior Court Rules of Criminal Procedure provides that "[a]ny error, defect, irregularity or vari-ance which does not affect substantial rights shall be disregarded." When assessing whether the erroneous admission of evidence was harmless, an appellate court must "quantitatively assess[] [the evidence] in the context of other evidence presented in order to determine [the effect it had on the trial]." *Humphrey,* 715 A.2d at 1276 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Given the number of threatening letters and other correspondence from defendant to Ms. Grayhurst that were admitted into evidence, "[i]t is not possible to reasonably imagine that the prosecution of the defendant * * * would not have gone forward or would have resulted in an acquittal but for the admission of the challenged [incriminating statement]. *Id.* The trial justice's refusal to grant defense counsel's motion to suppress was proper.

## VII

### Sufficient Evidence Exists to Support Defendant's Convictions for Extortion and Blackmail

 Next, defendant asserts that the state did not present evidence sufficient to support his extortion and blackmail conviction. The defendant contends that the statements forming the basis of the extortion and blackmail charges against him were not credible threats, but merely his emotional outbursts. The defendant further argues that, because his threats were not credible, they are protected under the First Amendment to the United States Constitution and that, as such, his conviction on these charges violates his right to free speech under the First Amendment.[11]

---

11. The defendant compares this case to *State v. McKenna,* 415 A.2d 729 (R.I.1980), in which this Court overturned a defendant's conviction for disorderly conduct based on an assessment that the defendant's threats were idle rather than genuine threats. In *McKenna,* however, this Court assessed whether the defendant's words constituted "fighting

We initially note that defendant's First Amendment argument is superfluous. The First Amendment does not protect against genuine threats. *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). The United States Supreme Court has defined genuine threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

Thus, the extortion and blackmail statute, § 11–42–2, criminalizes a category of speech, *i.e.* threats, that is not entitled to First Amendment protection. As a result, if defendant's statements were genuine threats, then they are not entitled to First Amendment protection, *Watts*, 394 U.S. at 707, 89 S.Ct. 1399, and are prohibited under § 11–42–2. If the statements were emotional rantings rather than genuine threats, however, then they are entitled to First Amendment protection and are not criminalized under § 11–42–2. The only issue here, therefore, is whether defendant's statements were genuine threats.

■■■■■ Extortion is "(1) an oral or a written threat to harm a person or property, (2) accompanied by the intent to compel someone to do something against his or her will." *State v. Price*, 706 A.2d 929, 933 (R.I.1998). The reasonableness of the victim's fear is not an element of the crime;

rather, the crucial question is the defendant's "subjective intent as demonstrated by his * * * conduct and by the words he * * * used * * * *." *Id.*

The defendant's letters to Ms. Grayhurst included statements such as "I love the shit out of you and I'm just praying that you'll come to your senses before it's too late;" "You have three options: (1) reconcile our differences; (2) pay me $373,814.81; (3) a one-way ride to Quidnessett;"[12] "I hope that you decide to reconcile our differences and get back together because if you don't I'm afraid you [*sic*] life wouldn't be worth a plug nickel;" "Don't underestimate what I'm capable of because you'll end up very, very *DEAD!*" These statements clearly evince defendant's subjective intent both to harm Ms. Grayhurst and to compel her to pay him money or reconcile against her will. As such, they constitute genuine threats in violation of § 11–42–2 and are unprotected by the First Amendment. Thus, we hold that there is sufficient evidence about the credibility of his threats to support defendant's convictions for extortion and blackmail.

## VIII

### Sufficient Evidence Exists to Support Defendant's Convictions for Threatening a Public Official

■■■■ The defendant also contests his convictions for threatening a public official

words" or "language likely to incite others to imminent illegal acts" rather than extortion and blackmail. *Id.* at 731. Thus, *McKenna* is inapplicable here. Additionally, the Court's decision in *McKenna* that defendant's threats were not genuine was based on the fact that the defendant uttered her threats in a moment of anger, while surrounded by police who clearly were not alarmed by the defendant's words. *Id.* at 732. Here, defendant made his threats in a calculated manner rather than in the midst of an emotional outburst. Also,

defendant had previously escaped from prison and gone straight to Ms. Grayhurst's home; there is every likelihood that, were defendant to leave prison again, he would do the same. In addition, the targets of defendant's threats, including Ms. Grayhurst and various public officials, clearly were alarmed by the threats.

12. Quidnessett refers to the cemetery where Ms. Grayhurst's mother is interred.

(P2/00–1052 counts 8 and 9). Section § 11–42–4 provides in pertinent part:

"Whoever knowingly and willfully delivers or conveys, directly or *indirectly,* a verbal or written threat to take the life of, or to inflict bodily harm upon, a public official or a member of his or her immediate family because of the performance or nonperformance of some public duty * * * shall be guilty of a felony * * *." (Emphasis added.)

Both the state and defendant agree that the evidence for counts 8 and 9 of P2/00–1052 consisted of defendant's statements to a sheriff that he "had a bullet for [General Magistrate] O'Brien and a bullet for Judge DeRobbio." [13] The defendant argues that, because he spoke his threats concerning General Magistrate O'Brien and Chief Judge DeRobbio to Family Court Sheriff Viera, he did not convey or deliver a threat to either public official.

■■■ This Court reviews questions of statutory interpretation *de novo. Martone v. Johnston School Committee,* 824 A.2d 426, 431 (R.I.2003). "When interpreting a statute, our ultimate goal is to give effect to the General Assembly's intent. * * * The best evidence of such intent can be found in the plain language used in the statute. Thus, a clear and unambiguous statute will be literally construed." *Id.* The plain language of § 11–42–4 clearly and unambiguously states that threatening remarks may be delivered indirectly. Thus, § 11–42–4 does not require that a threat be spoken directly to its target. Therefore, the threats to General Magistrate O'Brien and Chief Judge DeRobbio that defendant voiced to Sheriff Viera constitute a violation of § 11–42–4.

■■■ The defendant additionally reasserts his argument that his threats were not genuine relating to his conviction for threatening a public official pursuant to counts 8 and 9 of P2/00–1052. Like extortion and blackmail, a conviction for threatening a public official requires proof of a true threat. As expressed above, defendant's threats were genuine; thus we uphold his convictions on counts 8 and 9.

## IX

### Jury Instructions

The defendant argues that the trial justice gave incorrect jury instructions on the charges of threatening a public official, extortion and blackmail, and stalking. The trial justice instructed the jury on threatening a public official as follows:

"As far as the threats to [General] Magistrate O'Brien, Chief Judge DeRobbio and * * * as to O'Brien, Indeglia, Erickson, Pine, Almond, Jeremiah and DeRobbio. If a person makes a threat to an official the statute reads: 'Whoever knowingly and willfully delivers or conveys, directly or indirectly, a verbal or a written—or a written threat *to take the life of or inflict bodily harm* to a public official or member' it goes on to members of the immediate family. A defendant can be convicted of that crime even though the public official never knew about the threat. The mere making of a threat is a crime. It doesn't have to be conveyed to the public official. In other words, if the judges were not aware of the threat [it] is irrelevant." (Emphasis added.)

■■■ The defendant objects to this instruction, noting that he was charged with threatening the above-listed public officials with death, and arguing that the trial jus-

---

**13.** Judge DeRobbio is the Chief Judge of the Rhode Island District Court.

tice erred by instructing the jury that they could convict defendant if they found that he threatened the public officials with mere bodily harm as opposed to death.[14] The defendant notes that § 11–42–4 criminalizes threats to both "take the life of" and to "inflict bodily harm upon" public officials, and argues that these constitute separate offenses. The defendant and the state agree that under information P2/00–1114 defendant was charged with seven counts of threatening a public official with death. Thus, defendant argues that he was denied his due process rights because the trial justice failed to instruct the jury on the specific offense with which he was charged.

■■■■■ "The trial justice may instruct the jury in his or her own words as long as the charge sufficiently addresses the requested instructions and correctly states the applicable law." *State v. Lynch,* 770 A.2d 840, 846 (R.I.2001) (quoting *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988)). This Court will affirm a trial justice's instructions when, examined "from the perspective of a jury of ordinary intelligent lay people, the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *State v. Keiser,* 796 A.2d 471, 472 (R.I.2002) (mem.).

To support this argument, defendant cites to our discussion of disjunctively framed statutes in *In re Fiske,* 117 R.I. 454, 367 A.2d 1069 (1977). In *Fiske,* this Court held that

"[A] person charged with a particular offense cannot be convicted of another and distinct offense even though the other is closely related or of the same general character. * * * This is so even when a defendant is charged with violating a statute that * * * provides a penalty for acts in the disjunctive. It is true that under this kind of statute proof of any one of the proscribed acts will sustain a conviction, provided the charge is framed in the conjunctive. * * * When only one of the offenses set forth in the statute is charged, however, proof of one of the others will not suffice." *Id.* at 456–57, 367 A.2d at 1071–72.

This case is distinguishable from *Fiske.* The word "disjunctive" refers to a grammatical construction that "express[es] a choice between two words" or alternatives. *The Oxford Dictionary and Thesaurus* 410 (American ed., Oxford University Press 1996). The defendant in *Fiske* was charged under G.L.1956 § 11–35–17, which had a disjunctive structure; the statute provided that "*[w]hoever* shall telephone any person repeatedly * * * for the sole purpose of harassing, annoying, or molesting such other person or his family * * *; *or whoever* shall telephone any person for the purpose of using any threatening, vulgar, indecent, obscene or immoral language over the telephone * * *." *Fiske,* 117 R.I. at 457 n. 3, 367 A.2d at 1072 n. 3. (Emphasis added.) The language of the statute discussed in *Fiske,* therefore, sets out two separate offenses; that of telephoning a person in order to harass, annoy or molest them, and that of telephoning someone in order to use certain types of language (such as threatening or obscene

---

14. The defendant also reiterates his argument that because his threats to the above-mentioned public officials were not real threats, they are protected by the First Amendment. He additionally asserts that the trial justice failed to instruct the jury that proof of the delivery or conveyance of defendant's threats to those public officials was required. As previously stated in part VI of this opinion, defendant's threats were genuine threats and not protected by the First Amendment. Also, G.L.1956 § 11–42–4, which defines the crime of threatening a public official, does not require that defendant convey his threats directly to the subjects of those threats.

language). Unlike the statute discussed in *Fiske,* § 11–42–4 sets out the offense it governs—that of threatening a public official—only once. Although the portion of § 11–42–4 stating "a verbal or written threat to take the life of, or to inflict bodily harm upon" has a disjunctive structure, that structure is used to express a choice between two methods of committing a single crime. Section 11–42–4 sets out a single offense, that of threatening a public official, which can take the form of either a threat to that official's life, or of a threat to that official's bodily safety. The plain language of § 11–42–4 indicates, therefore, that the General Assembly intended to create only one offense under that statute. Consequently, the state's charge that defendant threatened public officials with death is a charge of violating § 11–42–4; the state has merely specified the manner in which defendant violated that statute. Therefore, the trial justice was not obligated to instruct the jurors that they could convict defendant only if they found he had threatened public officials with death. The trial justice's jury instructions consisted largely of his repeating § 11–42–4 nearly word for word. When examined "from the perspective of a jury of ordinary intelligent lay people, the [trial justice's] instructions adequately cover[ed] the law and neither reduce[d] nor shift[ed] the state's burden of proof." *Keiser,* 796 A.2d at 472. Thus, this Court will affirm the trial justice's instructions.

■ With respect to the jury instructions on extortion and blackmail and stalking, the defendant failed to object to those instructions at trial, and, therefore, "[a]ccording to our well-settled 'raise or waive' rule," has failed to preserve those issues on appeal. *Vorgvongsa v. State,* 785 A.2d 542, 547 (R.I.2001) (quoting *State v. Anderson,* 752 A.2d 946, 948 (R.I.2000)).

## X

### The Trial Justice's Answer to a Question from the Jury

■ The defendant also argues that the trial justice improperly failed to amend his answer to this question from the jury: "Can a no-contact order be violated by contacting a third party if the third party forwards the contact?" The trial justice responded "[t]hat's what this whole case is about. You have to decide this. The answer is if the person violating the no contact order reasonably expected that it would be forwarded by the person who sent it to another party, then yes." The defense counsel then objected. The trial justice responded "[a]nd for the record I might add tomorrow morning I'll tell them the state has to prove that the defendant intended it to be forwarded to his wife." The following morning, however, the trial justice failed to give the promised instruction, and defense counsel failed to remind the trial justice to do so.

■ When counsel makes an initial request for a particular instruction to the jury, and when the trial justice agrees to give the instruction and then later fails to give the instruction, counsel's failure to remind the trial justice of the requested instruction constitutes a failure to preserve the issue on appeal. *State v. Burke,* 529 A.2d 621, 627 (R.I.1987). Thus, defense counsel's failure here to remind the trial justice of the promised instruction means that defense counsel has failed to preserve this issue for consideration on appeal. We note that defendant argued defense counsel's failure to remind the trial justice of the requested instruction constituted ineffective assistance of counsel. Because defendant raises his ineffective assistance of counsel claim for the first time on direct appeal, however, he must pursue his claim through an application for post-conviction

relief pursuant to G.L.1956 § 10–9.1–1. *State v. Brouillard,* 745 A.2d 759, 768 (R.I. 2000).

## XI

### Amendment of Information

■ The defendant next contends that the trial justice improperly permitted the state to amend its information without his consent to reflect the proper date of counts 2 and 3 of information No. P2/00–1052, both of which originally charged defendant with extortion and blackmail on October 20 and 21 of 1998, respectively. After retiring to deliberate, the jury sent a note to the trial justice stating "[o]n P2/00–1052 count 2 October 20, 1998, we don't have evidence of that date. We do have a letter from October 20, 1997." The Court responded that "[i]t should read '97. All right. And then count 3 it should read instead of '98, '97." The state then moved to amend the information, prompting an objection from defense counsel; the trial justice denied the objection and allowed the state to amend its information.

■ Rule 7(e) of the Superior Court Rules of Criminal Procedure provides that: "At any time prior to verdict or finding, the court may with the consent of the defendant permit the indictment to be amended to correct an error in form or the description of the offense intended to be charged or to charge a lesser included offense. The court may permit an information or a complaint to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." Thus, an information can be amended without a defendant's consent if the amendment is non-prejudicial. This Court's examination of the trial court record reveals that neither defense counsel

nor the state ever noticed the discrepancy in dates. Additionally, defense counsel failed to suggest to the jury that the state had not presented sufficient evidence on the extortion charges that defendant attempted to contact Ms. Grayhurst on October 20 and 21, 1998. It is apparent, therefore, that defense counsel never took this discrepancy into account. Moreover, defendant did not assert an alibi or other defense that would make the offense date a crucial aspect of his defense. Given these facts, defendant was not prejudiced by the correction of what appears to have been a typographical error. Accordingly, we hold that the trial justice did not err by allowing the state to amend the information because the "substantive rights of the defendant" were not prejudiced.

## XII

### Motion for Judgment of Acquittal and Motion for New Trial

#### A

### Motion for Judgment of Acquittal

■ The defendant next argues that the trial justice erred in denying his motion for acquittal on the charges of assault and obstruction of a police officer (counts 1 and 3 of P2/97–3209) and on the charges of extortion and blackmail, threats to public officials, stalking, and violations of certain no-contact orders (counts 1, 2, 8, 9, 10, 12, 17, 18, 21, 23 and 26 of P1/00–1052).

"In reviewing a claim of legal sufficiency of the evidence in the context of a motion for a judgment of acquittal, this Court applies the same standard as that applied by the trial court, namely, '[we] must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.' " *Reis,* 815

A.2d at 63 (quoting *State v. Kaba*, 798 A.2d 383, 393–94 (R.I.2002)). "If, by that standard, the trial justice finds the evidence enough as a matter of law to support the charge, he must deny the motion and send the case to the jury." *Id.* (quoting *State v. Salvatore*, 763 A.2d 985, 990 (R.I.2001)).

As we discuss *infra*, the trial justice properly denied defendant's motion for new trial. Because "[t]he standard applied to a motion for judgment of acquittal requires less in the way of evidence than the standard applicable to a motion for a new trial[,] * * * it follows that the evidence was also sufficient to withstand a motion for a judgment of acquittal." *Kaba*, 798 A.2d at 394 (quoting *State v. Otero*, 788 A.2d 469, 475 (R.I.2002)).

## B

### Motion for New Trial

■ The defendant asserts that the trial justice failed to fully consider the argument defendant made in his motion for a new trial and that the trial justice, therefore, improperly denied his motion for a new trial. We disagree.

■ This Court has held that it "will affirm the trial justice's decision on a motion for a new trial unless it is 'clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence.'" *State v. Dyer*, 813 A.2d 71, 75 (R.I.2003) (quoting *State v. Jackson*, 752 A.2d 5, 12 (R.I.2000)). "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Nunes*, 788 A.2d 460, 464 (R.I.2002)

(quoting *State v. Salvatore*, 763 A.2d 985, 990–91 (R.I.2001)). "The record should reflect a few sentences of the trial justice's reasoning on each point, although the trial justice need only cite evidence sufficient for this Court to determine whether the trial justice applied the appropriate standards." *Id.* at 465. "If the trial justice reaches the same determination as did the jury, or if the justice determines that reasonable minds could have differed in reaching the verdict, the motion for a new trial should be denied." *Dyer*, 813 A.2d at 75.

The trial justice correctly stated that his role in deciding defendant's motion for new trial was to "review the evidence, assess credibility of the witnesses and * * * to act as the so-called thirteenth juror * * *." Having shown himself to be aware of the correct standards, the trial justice went on to refer to each one of the twenty-five counts of which defendant was convicted.[15] The trial justice then said that he had reviewed the evidence for each count and found that if he "were sitting without a jury [he] would have found the defendant guilty." Here, the trial justice has "cite[d] evidence sufficient for this Court to determine whether * * * [he] applied the appropriate standards." *Nunes*, 788 A.2d at 465. Thus, defendant has failed to demonstrate that the trial justice "overlooked or misconceived relevant and material evidence." *Dyer*, 813 A.2d at 75 (quoting *Jackson*, 752 A.2d at 12).

## XIII

### Ineffective Assistance of Counsel

Finally, defendant argues that he was denied his right to the effective assistance

---

**15.** The trial justice mistakenly referred to count 12 of P2/00–1052A as count 13. He also mistakenly mentioned count 8 of P2/00– 1114A, which does not appear either in the judgment or in the section of the transcript in which the trial justice sentenced defendant.

of counsel at trial, as guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution. The defendant asserts that because the alleged ineffective assistance is clear from the record and because of the complexity of the trial, this Court should consider his ineffective-assistance-of-counsel claim on direct appeal. This Court consistently has held, however, "that it will not consider a claim of ineffectiveness of counsel that is raised for the first time on a direct appeal. * * * Such matters must be pursued in an application for post-conviction relief pursuant to G.L.1956 § 10–9.1–1." [16] *Brouillard,* 745 A.2d at 768. The defendant's claim of ineffective assistance of counsel is raised for the first time on appeal. The supposed clarity of the record and complexity of the issues are not sufficiently compelling for this Court to consider here defendant's ineffective assistance of counsel argument.

## XIV

### Errors in the Judgments of Conviction and Commitment

The defendant calls attention to several discrepancies between the transcript of the defendant's sentencing by the trial justice and the judgments of conviction and commitment (judgments). The defendant requests that these clerical errors be remedied. Rule 36 of the Superior Court Rules of Criminal Procedure states in pertinent part that: "[c]lerical mistakes in judgments * * * arising from oversight or omission may be corrected by the court * * * on the motion of any party and after

such notice, if any, as the court orders." The trial justice was clear in his sentencing, and it appears the discrepancies on the judgments are the results of clerical errors. This Court orders that the judgments for P2/00–1114A, P2/00–1052A and for P2/97–3209A be remanded to the Superior Court Clerk for corrections to the errors on the judgments in accordance with the trial justice's stated sentencing as follows:

A. Case No. P2/00–1114A: The judgment states as to count 1 for threatening a public official that the sentence is "five years consecutive to the sentence serving." The trial justice simply indicated that the sentence is to be five years. After setting out the sentences for each conviction, the trial justice also stated that "these sentences are consecutive to the sentence [defendant's already] serving." Thus, in accordance with the trial justice's clear intent, the five year sentence for count 1 for threatening a public official shall run consecutive to the sentences defendant was serving as of the time of sentencing.[17]

B. Case No. P2/00–1052A:

i. The judgment provides as to count 1 for extortion and blackmail that the sentence is to be "consecutive with P2/00–1114A and with sentence on violation." The trial justice stated that the sentence is to be consecutive only with P2/00–1114A. That sentence will not, therefore, also run consecutively

---

**16.** General Laws 1956 § 10–9.1–1(a)(1) provides that people alleging that their criminal convictions were obtained "in violation of the constitution of the United States or the constitution or laws of this state" may file applications for post-conviction relief.

**17.** Of course, the sentences given for each of defendant's convictions also shall run consecutively to the sentences defendant already is serving. Thus, defendant will not begin to serve his time on any of the sentences given here until he has finished serving any previous sentences.

with any sentences imposed on violation of probation.

ii. The judgment only provides that the sentence on counts 2 and 3 of P2/00–1052A for extortion and blackmail, is fifteen years to serve. The trial justice additionally provided that the sentences for counts 2 and 3 are to be consecutive to P2/00–1114A. In accordance with the trial justice's stated sentencing, the sentence for counts 2 and 3 of P2/00–1052A for extortion and blackmail is fifteen years to serve, and will run consecutively to the sentences imposed in P2/00–1114A.

iii. The judgment provides that the sentences for counts 8 and 9, which are five years on each count, for threats to public officials, are to be concurrent with the fifteen year sentence for counts 1–3 of the same information. The trial justice, however, stated that the sentences on counts 8 and 9 are to be concurrent with counts 1–3 *and* P2/00–1114A. That, however, is not possible, because the sentences for counts 1–3 are to run consecutively to those in P2/00–1114A. Thus, if counts 8 and 9 run concurrently to counts 1–3, then they must also run consecutively, and not concurrently, to P2/00–1114A. Thus, the ten-year total sentence for counts 8 and 9 will be concurrent with the fifteen-year sentence for counts 1–3 and *not* with P2/00–1114A.[18]

iv. Concerning counts 12 and 13, both for violation of a no-contact order, and both with identical ten-year suspended sentences, the judgment refers to count 13 only, and the trial justice referred to count 12 only.

This mistake is repeated; the judgment states that the sentences for counts 17, 18, 21, 23 and 26 are to be consecutive to the sentences in counts 10 and *13*, while the trial justice stated that the sentences on the same counts are to be consecutive with counts 10 and *12*. It is apparent that the Judgment erroneously substituted count 13 for count 12. Wherever count 13 appears on the judgment for P2/00–1052A, it shall be replaced with count 12.

C. Case No. P2/97–3209A: The trial justice referred to counts 7, 9, 13 and 14, none of which appear on the judgment. These references appear to be either a transcription error or an error on the part of the trial justice because none of these counts appear in the trial justice's summary of charges, which he gave to the jury before their deliberations, or in the transcript of the jury's verdicts on each charge. Thus, these counts shall be stricken from the judgment for P2/97–3209A.

The corrected sentences are also set out in the chart of charges, convictions and sentences imposed located in the Appendix to this opinion. This Court notes that the amount of time defendant must serve is thirty-five years, and that the above corrections did not change defendant's total amount of time to serve.

Additionally, the defendant argues that, with regard to error B. iii., the trial justice in the sentencing transcript gave him a sentence that, as discussed above, is not logically sound. To remedy this discrepancy, the defendant requests that, pursuant to the rule of lenity, counts 8 and 9

---

18. We note that, because the ten-year sentence for counts 8 and 9 will run concurrently to the fifteen-year sentence for counts 1–3, defendant's time served will not increase as a result of this Court's remedy of the discrepancy between the judgment and the trial justice's stated sentencing.

should be deemed concurrent with the sentences in P2/00–1114A. "When the meaning of a criminal statute is ambiguous, the policy of lenity in the construction of criminal statutes requires that the less harsh of two possible meanings be adopted." *State v. Anthony*, 422 A.2d 921, 925 (R.I.1980). Here, the ambiguity affects the defendant's sentence rather than a criminal statute; the rule of lenity does not, therefore, apply. Nevertheless, as stated above, this Court's holding that counts 8 and 9 shall run concurrently with counts 1–3 will not increase the amount of time the defendant must serve.

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court for correction of the judgments of conviction and commitment in accordance with part XII of this opinion.

Justice SUTTELL did not participate.

## APPENDIX

### Chart of Charges, Convictions and Sentences Imposed in Accordance with this Opinion

| P2/00-1114A | Charge | Result | Sentence |
|---|---|---|---|
| Counts 1-7 | Threats to public officials | Guilty | 5 years each to serve, concurrent with each other and consecutive to the sentence defendant is already serving |
| Count 9 | Violation of no-contact order | Guilty | 5 years to serve, concurrent with Counts 1-7 |
| Counts 13 and 14 | Violation of no-contact order | Guilty | 10 years to serve, concurrent with Counts 1-7 and 9 |
| Count 15 | Violation of no-contact order | Guilty | 10 years to serve, *consecutive* with the sentences imposed for Counts 1-7, 9, 13 and 14 |
| **P2/00-1052A** | | | |
| Counts 1-3 | Extortion and blackmail | Guilty | 15 years to serve, *consecutive* with the sentences imposed in P2/00-1114A |
| Counts 8 and 9 | Threats to public officials | Guilty | 5 years to serve on each count, concurrent with Counts 1-3 |
| Count 10 | Stalking | Guilty | 10 years suspended, 10 years probation, consecutive to Counts 1-3 |
| Count 12 | Violation of no-contact order | Guilty | 10 years suspended, 10 years probation, concurrent with Count 10 |
| Count 13 *TO BE STRICKEN | Violation of no-contact order | Guilty | 10 years suspended, 10 years probation, concurrent with Counts 1-3 |
| Counts 17, 18, 21, 23 and 26 | Violation of no-contact order | Guilty | 5 years suspended on each count, 5 years probation, consecutive with Counts 10 and 12 |
| **P2/97–3209A** | | | |
| Count 1 | Assault on a uniformed sheriff/officer | Guilty | 3 years suspended, 3 years probation, concurrent with P2/00–1114A |
| Count 3 | Obstructing a police officer | Guilty | 1 year suspended, 1 year probation, concurrent with Count 1 |
| Counts 7, 9, 13, and 14 *TO BE STRICKEN | | | |
| Yearstoserve | 35 | | |