June 1, 2026

**Supreme Court**

No. 2023-288-C.A.
(K1/16-229A)

(Concurrence begins at Page 28)

State                    :

v.                       :

Nelson Carreiro.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                           :

v.                            :

Nelson Carreiro.                    :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

# O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Nelson Carreiro, appeals from a judgment of conviction on two counts of first-degree child molestation. On appeal, he argues that the trial justice erred in denying his motion to suppress statements he made to police because (1) he was in custody at the time the statements were made; (2) he did not reinitiate conversation with the police after he invoked his right to counsel; and (3) even if he did reinitiate the conversation, the state failed to prove that he knowingly and intelligently waived his right to counsel. The defendant further submits that the trial justice erred in denying his motion for judgment of acquittal on count one, because the state failed to prove a specific instance of penetration beyond a reasonable doubt. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Travel[1]

The sordid facts leading to this criminal appeal began in 2005, when the complainant was ten years old and in the fourth grade. At that time, she was living with her mother, Rosalie, in a small studio apartment to which a loft had been added (the studio apartment).[2] Rosalie would sleep in the loft, while the complainant slept in a doorless L-shaped room in the back of the apartment.

The complainant testified that she did not have many friends her own age, and the ones she did have, she did not see outside of school very often. However, she did spend time with her sister Stephanie—who was sixteen years old at the time— and other children and teenagers who also resided in her apartment building. Two neighbors with whom the complainant socialized were Corey, who was eighteen or nineteen years old, and Jarred, who was fifteen or sixteen years old. The complainant first became acquainted with defendant—twenty-five or twenty-six years old at that time—through Stephanie, Corey, and Jarred in 2005. She met defendant briefly one time before she and Stephanie moved to Florida, where the two lived with their older sister, Annie.

---

[1] We recite only those facts necessary to provide context on the issues raised by defendant in this appeal.

[2] We refer to members of the complainant's family and friends by their first names in order to preserve some measure of privacy. No disrespect is intended.

In December 2005, just after the complainant had decamped for Florida, defendant informed Rosalie that he "got thrown out of his parents' house because they thought he was gay[.]" Rosalie then invited defendant to live in the studio apartment with her. Shortly thereafter, the two began a sexual relationship. It was a short-lived relationship, according to Rosalie; defendant eventually told her that "[h]e didn't want to be with women" and that "[Rosalie] needed to see other people, that it really wasn't love that [they] shared."

In either May or June 2006, the complainant returned to Rhode Island to live with Rosalie, while Stephanie remained in Florida.[3] By that time, defendant had moved out of the studio apartment. The complainant resumed hanging out with Corey, Jarred, and defendant. The complainant testified that she thought defendant was "very attractive," that "[h]e had really nice green eyes, he was very friendly" and that "[e]veryone was really friendly with him, so he was * * * easy to get along with."

The complainant described herself, at that time, as a "very huggy person." When she and defendant watched television together she would "be wrapped around his arm or sitting right on * * * his lap, or just [be] in his arms." The physical interaction between the two progressed over time. On one occasion, the complainant and defendant were in the back L-shaped room of the apartment watching an anime

---

[3] The complainant was eleven years old at this time; she was born in January 1995.

movie while Rosalie slept in the loft.[4]  At one point, the complainant got up to use the bathroom and, when she returned, defendant was on his knees in front of her and pulled her in for a hug and "kissed [her] on the mouth."  After that incident, defendant said, "oops * * * that was bad," but the complainant told him it was fine and that she would not tell anyone it happened.  At the time, the complainant was "excited and happy" about the kiss; she described it as a "flattering moment" because she was "[h]ead over heels" for defendant.

That interaction changed the dynamic between the two of them.  The complainant testified that from that point on, "[a]nytime we'd have alone time, we would sneak kisses; and it was just like pecks on the mouth, still cuddling, still interacting like that; and then it eventually, * * * progressed from there."  The two increasingly spent more time alone with each other, especially at night, when Rosalie would either be sleeping in the loft or at her boyfriend's home next door; they saw each other just about every day.  The complainant testified that defendant would lift her shirt and "fondle [her] breasts and kiss on [her] chest[,]" and he would place her hand "directly onto his crotch" and she would feel "his genitals through his pants." Eventually their physical contact would escalate further, and defendant would stick "his fingers inside" of the complainant, by which she meant "[v]aginal penetration."

---

[4] "Anime" is "[a] style of animation developed in Japan, characterized by stylized colorful art and often adult themes." The American Heritage Dictionary of the English Language 71 (5th ed. 2011).

Once this occurred, defendant would digitally penetrate the complainant's vagina "pretty much every time" they were alone together.

At some point—while the complainant was still eleven years old—Rosalie became ill with pneumonia and broke a couple of ribs from coughing, which required her to stay in the hospital for a week. The defendant spent that week with the complainant in the studio apartment, during which time he would "cook [them] dinners" with "romantic candlelight[] and put music on and just tell [the complainant] how much [they] were supposed to be together * * *." During that week, defendant engaged in "[f]ull intercourse" with the complainant. When asked to explain what she meant by "[f]ull intercourse," the complainant explained it meant defendant's "penis was inside of [her] vagina."[5] At this point, the complainant considered herself to be in a relationship with defendant, in which she was "attached at the hip."

In June 2007, when the complainant was twelve years old, Rosalie married her boyfriend, Michael. Rosalie, Michael, and the complainant then moved into a three-bedroom apartment (the three-bedroom apartment), which was located upstairs

---

[5] When asked if this was the first time the two had vaginal intercourse, the complainant explained, "[n]o, but it was a lot easier" for them to have vaginal intercourse at that time because "no one was there." The complainant stated, "at that point I'm pretty sure we were already, like, knew the routine"; meaning, she was "[c]omfortable having sex when no one was around." It is unclear when they first engaged in "full intercourse."

from the studio apartment. The defendant also moved with the family into the three-bedroom apartment. The complainant testified that she was happy that defendant moved in with them: "It was great because that meant we were always going to be right next to each other at all times and he didn't have to leave at the end of the night, he would be right there." In the three-bedroom apartment, defendant and the complainant would have sex "almost every day" in defendant's room so they would be able to hear if Rosalie was approaching.

When the complainant entered fifth grade, she became more social and started making friends with children her age and would spend time with them outside of school. The complainant began spending time with a boy named Neil—one of Corey and Jarred's friends—and they "instantly * * * hit it off and became * * * best friends." The complainant testified that defendant was upset by this. She told him that she "didn't want to do anything else with him and [she] was done with him and [she] was breaking up with him in a sense."[6] The complainant eventually disclosed to Neil the nature of her relationship with defendant over online instant messaging and he encouraged her to inform the police; however, she did not do so. She

_____

[6] The complainant used air quotes when she testified that she "was breaking up with him * * *." She said she believed she was defendant's girlfriend, and defendant had plans for the two of them to "move across the world" and elope once she turned eighteen so "the world could know about [their] beautiful relationship and [their] forever love * * *."

confided in a few of her other friends as well, but, due to their young age, the complainant felt that "they didn't really understand."

In December 2007, Rosalie, Michael, and the complainant moved to Florida to live with Annie. One of the pastors of the church they attended in Florida discussed how he had been sexually abused as a child by his brother, the impact it had on his life, and the process of talking to officials about it. It was then that the complainant realized that what had happened between her and defendant was "a lot bigger than [she] initially minimized it to be." As a result, the complainant finally disclosed that she had been sexually abused by defendant to Rosalie, telling her, "[defendant] molested me and he raped me." Rosalie called defendant and told him, "I'm going to kill you." According to Rosalie, defendant simply responded, "I never meant to hurt her."

Within a year after she discovered her daughter had been sexually abused, Rosalie informed the Rhode Island State Police of the abuse, and the complainant spoke with a woman at a Child Advocacy Center (CAC) in Florida, recounting the molestation she had experienced.[7] In February 2010, Michael McGlynn—then a detective assigned to the Major Crimes Unit with the Rhode Island State Police—

---

[7] The CAC performs forensic interviews with children who are the victims of sexual assault and molestation. The interviewers are trained professionals who conduct interviews in "soft rooms"—as opposed to a police station—to create an environment "that is conducive to keeping the child at ease and comfortable and not traumatize the child anymore."

was assigned to investigate the complainant's allegations of sexual molestation. Detective McGlynn reviewed a DVD of the complainant's CAC interview and, after interviewing Rosalie and some of the complainant's friends in whom she had confided, determined that defendant was the main suspect in the investigation.

On June 17, 2010, Det. McGlynn went to defendant's residence in West Warwick to interview him. Detective McGlynn arrived at the home at seven in the morning in his "marked State Police car[.]" His partner, Detective Chris Schram came in his own vehicle. They waited until approximately 8:00 a.m. before knocking on the front door. The two detectives were greeted by defendant's brother, who informed them that defendant was staying in a basement apartment; he then led them to the backyard and through the backdoor into the basement where they found defendant in his bed. Detective McGlynn introduced himself and Det. Schram to defendant and asked him if he would accompany them to the Rhode Island State Police headquarters (the station) for questioning. The defendant apparently agreed to do so because he got dressed and entered the passenger side of Det. McGlynn's police vehicle.

The ride from West Warwick to the station took approximately thirty minutes; on the way, Det. McGlynn and defendant had a "pleasant" and "lighthearted" conversation about politics and the economy, but Det. McGlynn did not discuss the purpose of his visit. Upon arriving at the station, Det. McGlynn asked defendant to

take a seat in the lobby; he then secured his firearm and badge in a locker and ensured that a conference room was empty so that he could proceed to interview defendant. In the conference room—"a rectangular room with a large table, multiple chairs around the table, [and] bookshelves"—Det. McGlynn began the interview with defendant by informing him of his *Miranda* rights.[8]  Detective McGlynn read those rights aloud off a pre-printed form and wrote his badge number on the form after he explained each right to indicate that he had read them aloud.  He then asked defendant if he would be willing to speak with him and, if so, to sign the *Miranda* form acknowledging he had been read his *Miranda* rights.  The defendant agreed to speak with him and signed the form.

Detective McGlynn then began asking defendant about his relationship with Rosalie.  When defendant was asked, "[H]ow many times did you have sex with her?" he responded, "With Rosal[ie]?"  Because Det. McGlynn had yet to mention anyone else, he asked, "Who else could we be talking about?"  Detective McGlynn next questioned defendant about whether he had sex with the complainant, which defendant denied before stating, "I think I need to speak to an attorney."  Once defendant invoked his right to counsel, Det. McGlynn terminated the interview, walked defendant to the lobby, and informed defendant that he would arrange for someone to give him a ride home.  The defendant walked out of the building, and

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

Det. McGlynn followed him.  He then asked if Det. McGlynn would give him a ride, but Det. McGlynn told him that he would get another officer to do so.  Detective McGlynn testified that, as the two were standing outside the main entrance of the station, defendant asked Det. McGlynn, "Can I talk to you?"  They then walked to Det. McGlynn's car in the parking lot, where defendant sat on the hood and smoked a cigarette.  Detective McGlynn testified that "at some point in time" defendant initiated a conversation by saying, "You know I love that girl?"  Detective McGlynn understood "that girl" to reference the complainant, and he responded that he knew defendant loved her.  The defendant then became emotional and stated that "he was her knight in shining armor, he loved her, he would do anything for her."  Detective McGlynn testified that he told defendant, "I know you loved her * * * but you need to tell the truth. You need to get this off your chest, and I know it's bothering you."  The detective added that he further said, "now is your time to speak. If I speak to them and they say force was used," to which defendant said, "I didn't force her to do anything she didn't want to do."

Detective McGlynn asked defendant to reenter the station and give a statement, but again defendant stated, "I think I need an attorney."  Detective McGlynn then stopped speaking with defendant, found a uniformed trooper to give defendant a ride home, and instructed the trooper "[n]ot to speak to the defendant, not to discuss any legal advice, not to discuss anything with the case, and if

[defendant] were to bring it up not to respond." Detective McGlynn wrote a narrative of his interaction with defendant; however, he did not memorialize the outside conversation in that narrative.

Two months later, in August 2010, the state convened a grand jury to investigate the allegations against defendant. The complainant was still living in Florida at the time. She later testified that she had just been accepted into an accelerated high school program that would allow her to graduate with a bachelor's degree. As a result, the complainant decided to not come back to Rhode Island to pursue the case against defendant.[9] It was not until several years later, when she was nineteen or twenty years old, that she returned to Rhode Island to testify against defendant.

In 2016, a second grand jury charged defendant with two counts of child molestation, alleging that he had engaged "in sexual penetration, to wit, penis to vagina, with [the complainant], a person fourteen (14) years of age or under, in violation of [G.L. 1956] § 11-37-8.1 and § 11-37-8.2 of the General Laws of Rhode Island[.]" Count one alleged that such misconduct occurred between May 1, 2006, and May 1, 2007; and count two alleged that such misconduct occurred between September 1, 2007, and October 31, 2008. On March 5, 2023, defendant moved to

---

[9] It is not clear from the record what happened in the 2010 grand jury proceedings, but both the state and defendant agree that the case was withdrawn before the grand jury had the opportunity to deliberate on whether charges were warranted.

suppress any evidence of the conversation that took place outside the station between defendant and Det. McGlynn. He argued that he invoked his right to counsel when he initially requested an attorney and that Det. McGlynn refused to honor that request by continuing the conversation outside the station.

From March 6 to March 7, 2023, a trial justice considered defendant's motion to suppress and heard testimony from Det. McGlynn regarding his June 2010 interview with defendant. The trial justice ruled that, because defendant was not in custody, neither when he spoke to Det. McGlynn in the interrogation room nor when the two were talking outside the station, his *Miranda* rights did not apply and, therefore, there was no *Miranda* violation when the conversation continued outside. Alternatively, the trial justice decided that if defendant were in custody—and his *Miranda* warnings did apply—defendant sufficiently raised his Fifth Amendment right to counsel by stating, "I think I need a lawyer." However, the trial justice determined that defendant then waived his right to counsel when he initiated the conversation with Det. McGlynn outside the station by asking, "Can we talk?"

The defendant's trial began on March 7 and concluded on March 8, 2023. The jury heard testimony from the complainant, Rosalie, and Det. McGlynn. After the evidence in the case was fully heard, defendant moved for a judgment of acquittal on both counts of child molestation, arguing that there was no evidence specifying that any abuse occurred within the timeframes listed in the indictment for count one

and that there was no evidence to conclude that penile-vaginal intercourse occurred during the timeframe of count two. The trial justice denied the motion with respect to count one and reserved on count two. After deliberating, the jury found defendant guilty on both counts. At the sentencing hearing, the trial justice denied defendant's motion for judgment of acquittal as to count two. The defendant was then sentenced to forty years at the Adult Correctional Institutions, with eighteen years to serve on each count; both sentences were to run concurrently. This premature but valid appeal followed. A judgment of conviction entered on June 1, 2023.

## II

### Standard of Review

When this Court reviews "a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice." *State v. Morillo*, 285 A.3d 995, 1002-03 (R.I. 2022) (brackets omitted) (quoting *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010)). "This Court 'will not overturn a trial justice's factual findings unless they are clearly erroneous.'" *Id.* at 1003 (quoting *State v. Gonzalez*, 254 A.3d 813, 817 (R.I. 2021)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *State v. Grayhurst*, 852 A.2d 491, 513 (R.I. 2004)). "With respect to questions of law and mixed questions of law and fact involving

- 13 -

constitutional issues, however, this Court engages in a *de novo* review." *Id.* (brackets omitted) (quoting *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011)). "Whether a defendant was in custody and whether a waiver of constitutional rights was voluntary are questions that are reviewed *de novo*." *Id.*

## III

## Discussion

## A

## Motion to Suppress

The defendant first challenges the denial of his motion to suppress the statements he made to Det. McGlynn outside the station. Specifically, defendant argues that it was error for the trial justice to determine that (1) he was not in custody while he was outside the station; (2) he reinitiated the conversation with Det. McGlynn; and (3) the state provided enough evidence to find that defendant knowingly and intelligently waived his right to counsel. Each of those arguments will be discussed below.

## Custody

"Both the United States and Rhode Island Constitutions forbid the use of a defendant's involuntary confession." *State v. Corcoran*, 274 A.3d 808, 813 (R.I. 2022) (quoting *State v. Monteiro*, 924 A.2d 784, 790 (R.I. 2007)). "To safeguard this right, 'prior to custodial interrogation a suspect must receive explicit warnings

concerning his constitutional privilege against self-incrimination and his right to counsel.'" *Id.* (quoting *Grayhurst*, 852 A.2d at 513). "However, the warnings under *Miranda*, and exclusion of statements in violation thereof, are only required when a person is in custody and is undergoing interrogation by the police." *Id.*

"[A] person is in custody 'if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave.'" *Corcoran*, 274 A.3d at 813 (quoting *Jimenez*, 33 A.3d at 732). "In making this determination, a court may consider the following factors: (1) the extent to which the person's freedom is curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." *Id.* (quoting *State v. Briggs*, 756 A.2d 731, 737 (R.I. 2000)).

The trial justice determined that defendant was not in custody at any point during the June 17, 2010 interview—neither while he was inside nor outside the station—because "his freedom was not curtailed to an extensive degree or at all." The defendant's argument here necessarily relies on his being in custody while outside the station because, generally, a suspect's rights under *Miranda* only apply when he or she is (1) in custody and (2) subject to interrogation. *Corcoran*, 274 A.3d at 813. At oral argument, the state submitted that, although defendant had been

provided with *Miranda* warnings, the police could lawfully ignore the invocation of such rights because he was not in custody.

"We have long held that 'neither this Court nor the Superior Court should decide constitutional issues unless it is absolutely necessary to do so.'" *Houllahan v. Gelineau*, 296 A.3d 710, 726 (R.I. 2023) (brackets omitted) (quoting *In re Brown*, 903 A.2d 147, 151 (R.I. 2006)). "When facing a fork in the road, with one turn that will require this Court to slog through the thicket of a constitutional issue and the other offering a journey through more hospitable terrain, we routinely elect to take the path of least resistance." *Id.* (brackets and deletion omitted) (quoting *State v. Beaudoin*, 137 A.3d 717, 726 (R.I. 2016)). As explained below, even if defendant were in custody outside the station, his claim that his motion to suppress was denied erroneously still fails.

Thus, we decline to address the effect, if any, that Det. McGlynn reading defendant his *Miranda* rights has on the instant analysis and instead we will assume, *arguendo*, that defendant was in custody outside the station. *See Houllahan*, 296 A.3d at 726 ("This Court will not decide a constitutional question raised on the record when it is clear that the case before it can be decided on other grounds such that the determination of the constitutional question is not indispensably necessary for the disposition of the case.") (brackets omitted) (quoting *Amico's Incorporated v. Mattos*, 789 A.2d 899, 909 (R.I. 2002)).

**Reinitiating the Interview**

The trial justice's denial of defendant's motion to suppress did not rest solely on the issue of custody. He alternatively ruled that, even if defendant were in custody and had sufficiently invoked his right to counsel while in the station, he had reinitiated the interview with Det. McGlynn when he asked, "Can we talk[,]" rendering any subsequent conversation to be admissible.

"We have held that a criminal suspect may, during custodial interrogation, terminate the questioning by requesting an attorney, but the request does not preclude the suspect from subsequently waiving his right to counsel." *State v. Lionberg*, 533 A.2d 1172, 1176 (R.I. 1987). "In determining the admissibility of a confession by a defendant who initially has invoked one or more of his or her *Miranda* rights, two factors must be considered: (1) whether the defendant 'initiated conversation' with the authorities; and (2) whether, considering the totality of the circumstances, defendant waived his or her 'right to counsel and to remain silent,'" *State v. Brouillard*, 745 A.2d 759, 762 (R.I. 2000) (quoting *Lionberg*, 533 A.2d at 1177)—"that is, whether the purported waiver was knowing and intelligent * * * under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities," *Lionberg*, 533 A.2d at 1177 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)).

- 17 -

The defendant first argues that the trial justice erred in finding that defendant reinitiated the interrogation. The defendant asserts that "[i]t defies belief that moments [after defendant invoked his right to counsel that he] made a complete about-face and reinitiated the interrogation." Rather, he claims that he did not initiate a conversation with Det. McGlynn. He points to the fact that Det. McGlynn did not include any of defendant's subsequent statements in his contemporaneous narrative of his interactions with defendant. Additionally, he submits that, during the 2016 grand jury proceedings, Det. McGlynn testified that he "attempted to ask [defendant] more questions" as he walked outside the station. The defendant contends that this is enough evidence to show that it was clear error for the trial justice to determine that defendant initiated the conversation. Because that initiation never occurred, defendant submits, Det. McGlynn ran afoul of the United States Supreme Court's bright-line rule that all questioning of a criminal suspect in custody must cease once the suspect invokes his or her right to counsel.[10] The defendant is essentially attacking Det. McGlynn's credibility as a witness.

"This Court will not overturn a trial justice's findings of historical fact relevant to the voluntariness of a confession unless such findings are clearly erroneous." *State v. Bido*, 941 A.2d 822, 835 (R.I. 2008) (quoting *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I. 1998)). "A finding is clearly erroneous when, although

---

[10] *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 835-36 (quoting *State v. Perez*, 882 A.2d 574, 588 (R.I. 2005)). Additionally, an accused "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

The trial justice clearly found Det. McGlynn to be a credible witness and took the time to explain his reasoning on the matter. He indicated that it was fair to attack Det. McGlynn's credibility on the basis that he failed to record the conversation in his June 2010 narrative; however, he also noted that Det. McGlynn testified about the conversation during the 2010 grand jury proceedings only two months after the conversation took place, lending reliability to his testimony. Additionally, the trial justice determined that, although Det. McGlynn testified in the 2016 grand jury proceedings that he attempted to ask defendant more questions outside the station, the direct quote was, "I asked subsequent questions after the defendant said, 'Can we talk?[']" The trial justice observed that there was "no evidence in 2016 that negates the statement of 2010." He also noted that Det. McGlynn's testimony at the

pretrial hearing was "straightforward, that it was matter of fact, and that it appeared to be consistent with the series of statements that he had made previously."

We note that the trial justice's findings relative to Det. McGlynn's credibility were consistent with the record and that the concerns raised by defendant here were adequately addressed in the bench decision denying the motion to suppress. Thus, we do not have a "definite and firm conviction that a mistake has been committed," and it is our opinion that the trial justice's determination that defendant reinitiated the conversation with Det. McGlynn is not clearly erroneous. *Morillo*, 285 A.3d at 1003 (quoting *Grayhurst*, 852 A.2d at 513). Because defendant initiated the conversation, Det. McGlynn did not violate the bright-line rule of *Edwards* that all questioning of an accused must cease once he or she invokes the right to counsel, because there is a clear exception when "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.[11]

**Waiver of Rights**

With respect to the motion to suppress, defendant also argues that the state failed to prove, by clear and convincing evidence, that he knowingly and intelligently waived his right to counsel if he had reinitiated the conversation. While

---

[11] Notably, defendant does not argue that the question, "Can we talk?" is insufficient to reinitiate the interrogation—rather, he simply submits that the question never occurred.

granting deference to the trial justice's factual findings, we undertake a *de novo* review with respect to the voluntariness of defendant's statements to Det. McGlynn because constitutional rights are implicated. *Brouillard*, 745 A.2d at 762. "A defendant's confession is admissible if the state proves by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his constitutional rights, including his right to remain silent and to obtain legal representation." *Id.*

In conducting such a review, we resolutely conclude that defendant knowingly, intelligently, and voluntarily waived his right to remain silent and his right to counsel when he spoke with Det. McGlynn outside the station. Significantly, the trial justice credited the testimony of Det. McGlynn. The facts that unfolded that morning include the following. Before he was questioned, defendant was read his *Miranda* rights. There can be little doubt that he understood them; he in fact invoked them. When the focus of the interrogation shifted from Rosalie to the complainant, defendant said, "I think I need to speak to an attorney," at which point the questioning immediately stopped. The trial justice found that statement to be "an unequivocal request for an attorney."

Although a precise timeline is not evident from the record, it can be inferred that events were unfolding without any undue delay. As soon as defendant indicated that he wished to speak to an attorney and the questioning stopped, defendant exited

the interview room and walked to the main entrance, accompanied by Det. McGlynn. Their only conversation during this relatively short walk concerned finding defendant transportation home. There was a brief exchange concerning who would drive defendant home, and then he asked, "Can I talk to you?" They then walked, without speaking, to the parking lot where defendant said, "You know I love that girl."

There can be little doubt as to the import of the question, "Can I talk to you?" It is a clear, unmistakable invitation to either begin a conversation or simply make a statement. In the context of this case, it is an act by defendant that is inconsistent with the exercise of his right to counsel and his right to remain silent. *See Lionberg*, 533 A.2d at 1176. Within a matter of a few hours at most, he had been read his *Miranda* rights, signified his understanding of them, invoked his right to counsel, and observed the immediate cessation of the interrogation. The defendant was well aware of the powerful effect that the invocation of one's constitutional rights have, and we are well satisfied that he knowingly, intelligently, and voluntarily waived such rights when he asked Det. McGlynn, "Can I talk to you?"

Therefore, we affirm the trial justice's denial of defendant's motion to suppress.

# B

## Motion for Judgment of Acquittal

The defendant finally argues that his motion for judgment of acquittal on count one should have been granted, because the complainant "never testified about a specific act of penetration during the twelve months comprising Count 1." He acknowledges that the complainant testified about a specific week when they "had a lot more time to have sex; and that's mostly what [they] did for the entire time." However, he contends "[t]hat is not enough to satisfy this Court's standard of 'precise and specific testimony,'" as required by *State v. McDonald*, 602 A.2d 923, 925 (R.I. 1992). Rather, he categorizes the complainant's testimony as too vague to support a conviction.

Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure requires the court to grant a motion for judgment of acquittal "of one (1) or more offenses charged in the indictment * * * after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses." In reviewing the denial of such a motion "we apply the same standard as that applied by the trial justice; namely, we must view the evidence in the light most favorable to the state, give full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt." *State v. Thibedau*, 157 A.3d 1063, 1077 (R.I. 2017) (brackets and deletion omitted) (quoting *State v. Maria*, 132 A.3d 694,

698 (R.I. 2016)). "The trial justice's denial of the motion should be upheld when the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt." *Id.* (deletion omitted) (quoting *Maria*, 132 A.3d at 698).

The defendant first contends that "[t]his Court has long held that with 'respect to such a serious allegation, precise and specific testimony is necessary to support' the element of penetration." (Quoting *McDonald*, 602 A.2d at 925.) In *McDonald*, we held that a complainant's direct testimony was insufficient to support a finding of digital penetration when she testified "that her father had touched her 'in the vagina.'" *McDonald*, 602 A.2d at 925. This was because the complainant had also testified that her father "had touched her 'in the breasts.'" *Id.* We drew a distinction, physiologically speaking, between "*in* the vagina" and "*in* the breasts," because a person's breasts cannot be penetrated in the same manner as a person's vagina. *See id.* (emphasis added). Therefore, the complainant's use of the word "in" was not specific enough to show, beyond a reasonable doubt, that her vagina had been penetrated as opposed to being touched externally. *See id.*

The facts of *McDonald* are dissimilar to the facts of the case at bar. Here, the complainant stated that while Rosalie was in the hospital, defendant engaged the complainant in "[f]ull intercourse." She then clarified that by "[f]ull intercourse" she meant "[h]is penis was inside of my vagina." Unlike in *McDonald*, there is no

- 24 -

indication in the record that the complainant ever used the term "inside" while referring to defendant touching her externally. Thus, the complainant's statement, while "view[ing] [it] in the light most favorable to the state," is sufficiently specific enough to show that defendant had inserted his penis into her vagina. *See Thibedau*, 157 A.3d at 1077.

Count one also includes a date range; thus, the state was required to not only prove that defendant had penetrated the complainant's vagina, but also that it occurred between "the 1st day of May, 2006 and the 1st day of May, 2007 * * *." The defendant contends that the state failed to produce any such evidence because the complainant only testified that defendant engaged her in sexual intercourse over the course of the year, without alleging any specific instance, and that the one-week span when her mother was in the hospital was too vague.

To support that argument, defendant points to *Thibedau*. In that case, the complainant had testified that the defendant had sexually abused her over one hundred times within a three-year period. *Thibedau*, 157 A.3d at 1068. Count one of that indictment alleged that "on or about a day and date between the 1st day of August, 2009 and the 31st day of August, 2009, [the] defendant did engage in sexual penetration, to wit, penile to vaginal penetration, with [the complainant], a person fourteen (14) years of age or under." *Id.* at 1078 (brackets and deletions omitted). The defendant had earlier requested a bill of particulars, to which the state responded

that "count 1 related to the first time [the] defendant engaged in penile/vaginal penetration with [the complainant], which is believed to have been a day or date around August 2009." *Id.* (brackets and deletions omitted). The defendant moved for a judgment of acquittal, arguing that "the evidence regarding the one hundred incidents of child molestation that occurred in the same time frame set out in count one, rendered count one duplicitous." *Id.* at 1077. The issue was "whether some members of the jury could have convicted defendant on count 1 based on one of the more than one hundred uncharged incidents of sexual assault, rather than the assault alleged in count 1." *Id.* at 1078. We affirmed the trial justice's denial of that motion because, although the testimony of "the more than one hundred acts of uncharged conduct was vague and simply acknowledged that 'the same thing happened every time,'" the complainant had also testified that

> "after the weekend of July 4, 2009, [the complainant] began smoking. She then testified that shortly thereafter, defendant grabbed her breast for the first time. * * * [The complainant] also testified that 'about a week later,' defendant fondled her breasts in his room and then, 'about a week after that,' he penetrated her for the first time. This penetration is the assault alleged in count 1." *Id.* (brackets omitted).

That testimony was specific enough, and followed the timeline from July 4, 2009, to show the first instance of penetration occurred in August 2009. *See id.*

Here, the complainant testified that, during the week her mother was in the hospital, defendant engaged in "[f]ull intercourse" with her, meaning "[h]is penis

was inside of [her] vagina." She described it as "the routine," by which she meant that they were "[c]omfortable having sex when no one was around." She explained that "[w]e had a lot more time to have sex; and that's mostly what we did for that entire time."

Unlike in *Thibedau*, defendant here did not request a bill of particulars—which could have limited the indictment to the first instance of penetration—nor does he argue that count one was duplicitous. However, there is evidence in the record to show that Rosalie spent a week in the hospital between May 1, 2006, and May 1, 2007. The complainant testified that she was born in January 1995 and that Rosalie was in the hospital when she was eleven years old. Additionally, the record suggests that between December 2005 until either May or June 2006, the complainant was living in Florida. Therefore, Rosalie's stay in the hospital must have occurred between either May or June of 2006, when the complainant returned to Rhode Island, and January 2007, when she would turn twelve. Viewing that testimony in the light most favorable to the state, and drawing all reasonable inferences consistent with guilt, a reasonable juror was entitled to conclude that defendant engaged in vaginal intercourse with the complainant while Rosalie was in the hospital in the specified time period. *See Thibedau*, 157 A.3d at 1077.

Accordingly, we affirm the trial justice's denial of the motion for judgment of acquittal on count one.

# IV

## Conclusion

For the reasons set forth herein, the judgment of the Superior Court is affirmed, and the record of this case shall be returned thereto.

Justice Goldberg participated in the decision but retired prior to its publication.

**Justice Robinson, concurring in the judgment.**  I concur in the judgment of the Court, but I do so in a *dubitante* and somewhat troubled frame of mind.

I have spent many hours of my time in an unsuccessful attempt to find unequivocal authority from one or more state or federal appellate courts to the effect that, as a sort of corollary to *Miranda*,[1] there should be a mandatory "cooling-off" period of meaningful duration (perhaps two hours) between the moment when a citizen invokes his or her right to counsel pursuant to *Miranda* and the resumption of interrogation—even when it is the citizen who has invited the resumption of a substantive discussion with the interrogator.[2]  I have also searched in vain for

---

[1]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]     Since I am concurring only in the judgment, I see no need to comment on the Court's weighing of relevant facts that resulted in the Court's statement that it is "well satisfied that [Mr. Carreiro] knowingly, intelligently, and voluntarily waived [his *Miranda*] rights when he asked Det. McGlynn, 'Can I talk to you?'"

authority holding that, before such a substantive interrogation resumes, the interrogator must, in clear and explicit language, remind the person who just a short while previously invoked the right to counsel of the fact that he or she has very recently invoked that important constitutional right.

In forming my view of this case, I have kept constantly in mind the following words from *Miranda v. Arizona*, 384 U.S. 436 (1966):

> "Once warnings have been given, the subsequent procedure is clear. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Miranda*, 384 U.S. at 473-74.

I have similarly been almost haunted by the following observation penned nearly a century ago by the great champion of the Bill of Rights who was Justice Black:

> "It has been pointed out that courts indulge every reasonable presumption against waiver of fundamental constitutional rights and that *we do not presume acquiescence in the loss of fundamental rights*." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (emphasis added) (internal quotation marks and footnotes omitted).[3]

---

[3] The following words from Justice Brennan's concurring opinion in *Connecticut v. Barrett*, 479 U.S. 523 (1987), in which he discusses the profound and

The principal focus of this concurring opinion is on the rapidity with which Det. McGlynn obtained an incriminating statement from Mr. Carreiro within a few short minutes after he had invoked his constitutionally protected right to counsel ("I think I need to speak to an attorney."). This took place at a time when Mr. Carreiro was still in State Police custody, still on State Police property, still accompanied by Det. McGlynn, and still not in a place where (as a practical matter) he could reach out for the assistance of an attorney.

It is critically important to keep in mind how quickly events took place from the moment that Mr. Carreiro first invoked his right to counsel while being interrogated inside the State Police headquarters until Det. McGlynn seized upon an ambiguous question ("Can I talk to you?") and two non-inculpatory statements by

---

far-reaching implications of *Miranda v. Arizona*, 384 U.S. 436 (1966), are also deserving of close attention as one considers the implications of the instant case:

> "A statement obtained from a defendant during custodial interrogation is admissible only if the State carries its heavy burden of establishing that a defendant has executed a valid waiver of the privilege against self-incrimination and the right to counsel. To do so, the State must demonstrate an intentional relinquishment or abandonment of a known right or privilege. In making this determination, courts must examine the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."
> *Barrett*, 479 U.S. at 531 (Brennan, J., concurring) (internal quotation marks and citations omitted).

Mr. Carreiro about his affection for the complainant as an opportunity to encourage Mr. Carreiro to say more. The tersely written narrative of events in the Court's opinion tellingly reflects the fast pace with which everything occurred in that very short period of time:

> "Detective McGlynn next questioned defendant about whether he had sex with the complainant, which defendant denied before stating, 'I think I need to speak to an attorney.' Once defendant invoked his right to counsel, Det. McGlynn terminated the interview, walked defendant to the lobby, and informed defendant that he would arrange for someone to give him a ride home. The defendant walked out of the building, and Det. McGlynn followed him. He then asked if Det. McGlynn would give him a ride, but Det. McGlynn told him that he would get another officer to do so. Detective McGlynn testified that, as the two were standing outside the main entrance of the station, defendant asked Det. McGlynn, 'Can I talk to you?' They then walked to Det. McGlynn's car in the parking lot, where defendant sat on the hood and smoked a cigarette. Detective McGlynn testified that 'at some point in time' defendant initiated a conversation by saying, 'You know I love that girl?' Detective McGlynn understood 'that girl' to reference the complainant, and he responded that he knew defendant loved her. The defendant then became emotional and stated that 'he was her knight in shining armor, he loved her, he would do anything for her.' Detective McGlynn testified that he told defendant, 'I know you loved her * * * but you need to tell the truth. You need to get this off your chest, and I know it's bothering you.' The detective added that he further said, 'now is your time to speak. If I speak to them and they say force was used,' to which defendant said, 'I didn't force her to do anything she didn't want to do.'

> "Detective McGlynn asked defendant to reenter the station and give a statement, but again defendant stated, 'I

- 31 -

think I need an attorney.' Detective McGlynn then stopped speaking with defendant, found a uniformed trooper to give defendant a ride home, and instructed the trooper '[n]ot to speak to the defendant, not to discuss any legal advice, not to discuss anything with the case, and if [defendant] were to bring it up not to respond.'"

The non-stop pace with which this series of events took place is notable and is deeply troubling. Mr. Carreiro's brief statements after saying to the detective just outside the headquarters building "Can I talk to you?" were in no sense inculpatory. Rather than being confessions of criminal conduct, they were simple professions of love—however misguided many might deem such a love to be. It is significant that the detective's first step after hearing Mr. Carreiro's profession of love for "that girl" and his further statement that he considered himself to be "her knight in shining armor" was to immediately and radically escalate the dialogue by exhorting Mr. Carreiro to "tell the truth" and to "get this off your chest" and then to suggest that some unnamed persons ("they") might say that "force was used."

In my view, it is disconcerting, and indeed shocking, that, so very shortly after Mr. Carreiro had invoked his right to counsel while being interrogated inside the State Police headquarters building, Det. McGlynn seized upon Mr. Carreiro's non-inculpatory professions of love as an opportunity to encourage him to waive his very recent invocation of his constitutionally protected right to counsel. The detective actually suggested to Mr. Carreiro that it might be advantageous for him if he could provide the detective with further details about the relationship between the

- 32 -

complainant and Mr. Carreiro ("[N]ow is your time to speak.").  At no point did Det. McGlynn remind Mr. Carreiro that he had, just moments before, explicitly invoked his constitutionally derived right to counsel when he said: "I think I need to speak to an attorney."

Although I have been unable to locate authority that is squarely "on point," it seems to me that the Supreme Court's epochal holding in *Miranda v. Arizona*, 384 U.S. 436 (1966), should be understood as implicitly requiring that investigating authorities treat with special respect and deference an individual's invocation of his or her right to counsel.  The *Miranda* opinion is itself predicated on the Fifth Amendment to the United States Constitution. *Miranda*, 384 U.S. at 470; *see State v. Dumas*, 750 A.2d 420, 424 (R.I. 2000) ("The United State Supreme Court has determined that in order to safeguard the right against self-incrimination provided by the Fifth Amendment to the United States Constitution, a suspect who is subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning.") (footnote omitted).

With no small degree of reluctance, I concur in the judgment of the Court, although I decline to join the opinion itself.  While I acknowledge that the majority opinion is faithful to the present state of our law with regard to *Miranda*-based rights, it is my view that those rights are of such enormous importance that further protections should be mandated in order to assure that a citizen fully benefits from

his or her invocation of the rights recognized in *Miranda*.  As I stated at the outset of this concurring opinion, I believe that, even when a citizen seeks to reinitiate a conversation with an interrogator, there should be (1) a "cooling-off" period before actual interrogation resumes and (2) an explicit reminder to the person about to be reinterrogated that he or she has very recently invoked the constitutionally protected right to counsel.  It is my fervent hope that our law will evolve in that direction.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Nelson Carreiro. |
| **Case Number** | No. 2023-288-C.A. (K1/16-229A) |
| **Date Opinion Filed** | June 1, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Luis M. Matos |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br>For Defendant:<br><br>Michael G. Ewart<br>Rhode Island Public Defender |